**RAÚL R. LABRADOR**
**ATTORNEY GENERAL**

**MICHAEL J. KANE**
**SPECIAL DEPUTY ATTORNEY GENERAL**
**MICHAEL KANE & ASSOCIATES, PLLC**
702 W. Idaho St., Suite 1100
Post Office Box 2865 (83701)
Boise, Idaho 83702
Telephone: (208) 342-4545
Email: mkane@ktlaw.net
Idaho State Bar No. 2652

ATTORNEYS FOR IDAHO STATE DEFENDANTS

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| AVALON HARDY | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:23-cv-00306-BLW |
| | ) | |
| vs. | ) | |
| | ) | |
| MICHAEL KISH, CHARLES KETCHUM, | ) | AFFIDAVIT OF MICHAEL KANE IN |
| TROY DEBIE, KYLE CARD, and STEVEN | ) | SUPPORT OF DEFENDANTS' |
| McCLAIN, in their individual capacities, and | ) | MOTION FOR SUMMARY |
| JOHN/JANE DOES 1-10, other law enforcement | ) | JUDGMENT |
| officers whose true names are unknown, in their | ) | |
| individual capacities, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

STATE OF IDAHO    )
                  : ss.
County of Ada     )

     I, MICHAEL KANE, being first duly sworn, depose upon oath and state that:

    1.    I am legal counsel for the Defendants in the above-entitled matter.

2.        Attached are true and correct copies of the following:

(a) Exhibit A – Deposition of Avalon Hardy, taken March 19, 2024: Cover page, pgs. 14-16; 24-26; 88; 94-97; 116-117; 126-129; 134-135; 139; 145-148; 159-160; 162-163; 167-170; 173-179; 186; 201-202; 206-214; Reporter's Certificate.

(b) Exhibit B – Deposition of Casey Parsons, taken May 24, 2024: Cover page, pgs. 10-13; Reporter's Certificate.

(c) Exhibit C – Deposition of Megan Harrigfeld, taken May 24, 2024: Cover page, pgs. 16-17; 22; Reporter's Certificate.

(d) Exhibit D – Deposition of Destinee Brooks, taken June 11, 2024: Cover page, pgs. 35-36; Reporter's Certificate.

(e) Exhibit E – Plaintiff's First Responses to Defendants' First Set of Discovery, cover page, p. 5; Avalon Hardy verification (November 24. 2023), p. 16.

(f) Exhibit F – Trial Transcript, State of Idaho v. Avalon Shawntea Hardy, Ada County Case No. CR01-22-20001, Honorable Michael Dean, Presiding Judge, Caption page, pgs. 27-51; 61-62; 64-66, Reporter's Certificate.

(g) Exhibit G – You Tube Video, taken June 24, 2022.

(h) Exhibit H – July 12-2 Video.

(i) Exhibit I – Affidavit of Probable Cause and PC Minute Sheet, Dated June 29, 2022.

Further your Affiant sayeth not.

DATED this _12_ day of July, 2024.

_____
MICHAEL KANE

SUBSCRIBED AND SWORN before me this _12_ day of July, 2024.



_____
Notary Public for State of Idaho
Residing at: _____
My Commission Expires: _5-16-27_

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the _12_ day of July, 2024, I electronically filed the foregoing document with the U.S. District Court. Notice will automatically be electronically mailed to the following individuals who are registered with the U.S. District Court's CM/ECF System for this action:

- **Richard A. Eppink, David DeRoin**
  ritchie@wrest.coop, david@wrest.coop

- **Michael J. Kane**
  mkane@ktlaw.net, tpresler@ktlaw.net

_/s/ Michael J. Kane_
MICHAEL J. KANE

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF IDAHO

 3

 4      AVALON HARDY,                     )

 5              Plaintiff,                ) Case No. 1:23-cv-00306-BLW

 6      vs.                               )

 7      MICHAEL KISH, CHARLES KETCHUM,    )

 8      TROY DEBIE, KYLE CARD, and        )

 9      STEVEN McCLAIN, in their          )

10      individual capacities, and       )VIDEOTAPED DEPOSITION OF

11      JOHN/JANE DOES 1-10, other law    )      AVALON HARDY

12      enforcement officers whose        )  TAKEN MARCH 19, 2024

13      true names are unknown, in        )

14      their individual capacities,      )

15              Defendants.               )

16      _____  )

17

18

19

20

21      REPORTED BY:

22      ANDREA L. CHECK, CSR No. 748, RPR, CRR

23      Notary Public

24

25
```

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

| | |
|---|---|
| 1 checkmarks. One of them has "Race," and it has "White." | 1 A. Correct. |
| 2 You, in your complaint, Exhibit 7, identify as Black. | 2 Q. All right. And then below that, Question |
| 3 A. Yes. | 3 No. 7, "Are you aware of any serious injuries or need of |
| 4 Q. Can you explain how that may have happened? | 4 any immediate medical attention?" The answer, "No." |
| 5 MR. EPPINK: Objection; calls for speculation. | 5 A. [Witness nods head.] |
| 6 Q. (BY MR. KANE) Go ahead. | 6 Q. Is that a "yes"? |
| 7 A. I didn't answer these questions. They just | 7 A. Yes. |
| 8 filled them out. So I assume that they put "White." | 8 Q. You're agreeing with that? |
| 9 Q. You didn't answer any questions at all? | 9 A. Yes. |
| 10 A. I did answer some. I answered who my contact | 10 Q. Now, we don't -- I didn't go over the normal |
| 11 person was, my email -- or my address, and then my name. | 11 things we say, don't nod; she won't know what to do. |
| 12 Q. Well, okay. You see I've got the checkmark | 12 A. Yes. |
| 13 "HEIGHT" and "WEIGHT," and it says, 5-9 and | 13 Q. All right. So down to Question 14, "Was |
| 14 "280" pounds; is that fair? Is that right? | 14 arrestee involved in a fight, vehicle accident, had |
| 15 A. I am 5-9. I do not weigh 280 pounds. | 15 force used upon, tased, OC sprayed or involved in |
| 16 Q. Well, this was a couple of years ago. | 16 another incident?" The answer, "No." |
| 17 A. Yeah. I don't think I weighed 280 pounds | 17 Is that correct? |
| 18 then, either. | 18 A. Yes. |
| 19 Q. So how do you think that number got on there? | 19 Q. All right. So you told Sanda that you were |
| 20 MR. EPPINK: Objection; calls for speculation, | 20 not in need of medical care when you were in jail -- |
| 21 form. | 21 A. Correct. |
| 22 THE WITNESS: Possibly previous arrests. | 22 Q. -- on June 22nd of 20 -- June 28th of 2022? |
| 23 Q. (BY MR. KANE) Okay. What do you think you | 23 A. Correct. |
| 24 weighed on the day of your arrest here? | 24 Q. All right. |
| 25 MR. EPPINK: Objection; calls for speculation. | 25 All right. Go a couple of pages further in, |
| Page 14 | Page 16 |

| | |
|---|---|
| 1 THE WITNESS: Probably around 320. | 1 and you see in the Jail Booking Information now we have |
| 2 Q. (BY MR. KANE) Okay. Thank you. All right. | 2 a person named David Welch. |
| 3 I want you to go to the next page. And these | 3 Do you see where we are here -- |
| 4 are entitled, "JailBookingQuestions." | 4 A. Yes. |
| 5 Do you see that? | 5 Q. -- "Questionnaire Report"? And this says, |
| 6 A. Yes. | 6 "Additional Information"; correct? |
| 7 Q. All right. Now, were these questions asked by | 7 A. Yes. |
| 8 you by Sanda Bosnjak? | 8 Q. All right. And do you remember being asked by |
| 9 MR. EPPINK: Objection. | 9 David Welch questions? |
| 10 Q. (BY MR. KANE) Can you see her name up there | 10 A. Yes. |
| 11 as the person booking you in? | 11 Q. And did you try to answer truthfully? |
| 12 MR. EPPINK: Objection to form. | 12 A. Yes. |
| 13 THE WITNESS: I do see her name. | 13 Q. All right. Go down to -- it says "PV3," at |
| 14 Q. (BY MR. KANE) Is that "yes"? | 14 the very bottom there. |
| 15 A. Yes. | 15 Do you see that? |
| 16 Q. And did you answer them truthfully? | 16 A. Yes. |
| 17 A. Yes. | 17 Q. "Is this the inmates first incarceration?" |
| 18 Q. All right. If you go to Question 5, you see, | 18 Answer, "No." |
| 19 "Has any other" -- I'm sorry, I'll read it right -- "Has | 19 Do you see that? |
| 20 another individual informed you of any suicidal behavior | 20 A. Yes, I do. |
| 21 or need for medical care?" The answer, "No." | 21 Q. And was that truthful? |
| 22 Do you see that? | 22 A. Yes. |
| 23 A. Yes. | 23 Q. All right. I want you to go two more pages |
| 24 Q. Did you tell Sanda that you did not need | 24 in, and now we have a section that says, "Jail |
| 25 medical care? | 25 Classification Questions." |
| Page 15 | Page 17 |

5 (Pages 14 - 17)

Page 22

1    Q. Were you given medications for your
2  depression?
3    A. Yes.
4    Q. Do you know what it is?
5    A. No.
6    Q. All right. And when did that medication stop?
7    A. I don't recall exact dates. I'm going to say
8  probably 2013.
9    Q. Do you think that you still had depression
10  after 2013?
11    A. No.
12    Q. Ever?
13    A. I think that I've had episodes of depression,
14  yeah.
15    Q. Okay. I know you didn't time them, but give
16  me an idea when we're talking about you've had these
17  episodes of depression.
18    A. I'm sorry, can you reask that?
19    Q. Sure. After 2013, it sounds like you say you
20  had episodes of depression. Tell me about those
21  episodes. When were they?
22    A. At various times of my life depending on what
23  was going on. Moving, kid -- between kids and
24  relationship problems, people passing away, various
25  times of my life.

Page 23

1    Q. Did you have any sort of medication for that
2  depression at any time?
3    A. No, not after that.
4    Q. Did you have a mental health counselor of any
5  kind after 2013?
6    A. No.
7    Q. The reason I'm asking these questions is that
8  in H21 it's written in the present tense: "Do you
9  currently have any mental health issues," and you
10  answered "Yes."
11    A. Yes.
12    Q. So did you believe you had mental health
13  issues when you were arrested on June 28th of 2022?
14    A. Yes.
15    Q. And what was that?
16    A. Depressed.
17    Q. Okay. How long had that episode of depression
18  been ongoing?
19    A. A couple of weeks.
20    Q. Was there a specific cause of that depression?
21    A. I don't recall a specific cause. There was
22  lots of things going on.
23    Q. Like what?
24    A. This bill being passed, my relationship was
25  suffering a little bit at that time, I had a friend that

Page 24

1  had passed away, so.
2    Q. Do you consider yourself depressed now?
3    A. Slightly.
4    Q. Did it get better since 2022?
5    A. It never really went away.
6    Q. Had you been medicated since 2022?
7    A. No.
8    Q. Would it be fair to say that depression is
9  something that you live with continuously for, say, the
10  last ten years?
11    MR. EPPINK: Objection; asked and answered.
12    THE WITNESS: Yes.
13    MR. KANE: Thank you.
14    Q. (BY MR. KANE) All right. Okay. Go several
15  pages in, and you're going to get to a page that says,
16  "Charge Information."
17    Do you see that? And let me know when you get
18  there. It says, "Charge Information" right on the top.
19    A. Yes.
20    Q. All right. Now, you'll look, and you'll see
21  there are dates and times listed on this page. And
22  before we get to that, I want you to go to the very top.
23  It says, "Battery on a Law Enforcement Officer,"
24  "Felony."
25    Do you see that?

Page 25

1    A. Yes.
2    Q. All right. And you see right at the top, it
3  says, "Charge Date/Time."
4    Do you see that?
5    A. Yes.
6    Q. 6-28-22, 19:20:00, that would be 7:20 in the
7  afternoon?
8    A. Yes.
9    Q. Is that approximately the time that you were
10  arrested on that day?
11    MR. EPPINK: Objection; calls for a legal
12  conclusion.
13    THE WITNESS: Yes.
14    Q. (BY MR. KANE) All right. And it says,
15  "Charge Disposition," [as read] "ROR - released to your
16  own recognizance."
17    Do you see that?
18    A. Yes.
19    Q. So from that, is it fair to say that you were
20  released on your own recognizance without having to post
21  bail on this felony charge?
22    A. Yes.
23    Q. And was that the next day?
24    A. Yes.
25    Q. All right. Go to the next page, if you would.

7 (Pages 22 - 25)

Avalon Hardy March 19, 2024

1  And it says, "Log Report."
2      Do you see that?
3      A. Yes.
4      Q. Now, you see that it says, on the top of this
5  list of times, it says, "6/29/22 4:21:18 PM."
6      Do you see that?
7      A. Yes.
8      Q. And that's your release date and time; right?
9      A. Yes.
10     Q. So would it be fair to say that you were
11 arrested at approximately 7:20 in the afternoon on the
12 28th, and you were released on the next day at 4:21?
13     MR. EPPINK: Objection; calls for a legal
14 conclusion.
15     THE WITNESS: I -- yes.
16     Q. (BY MR. KANE) All right. It's really not a
17 trick question. You were in jail for less than
18 24 hours; correct?
19     A. Yes.
20     Q. All right. Did you ever go to jail again on
21 this felony charge?
22     A. No.
23     Q. All right.
24     All right. I want to talk a little bit about
25 your previous criminal history.

Page 26

1      A. Okay.
2      Q. Before we start getting into specific
3  documents, just give me a rundown on your previous
4  criminal history.
5      MR. EPPINK: Objection; form, calls for a
6  narrative.
7      Q. (BY MR. KANE) Let's begin with the first time
8  that you were arrested at, I think you said, age 18?
9      A. Yes.
10     Q. All right. And when, approximately, was that?
11 What would the date have been?
12     A. I don't recall the date. It was shortly after
13 I turned 18, though.
14     Q. And what was your arrest about?
15     MR. EPPINK: Objection; calls for a legal
16 conclusion.
17     THE WITNESS: I believe it was driving without
18 a license.
19     Q. (BY MR. KANE) Okay. You were actually
20 physically arrested for driving without a license?
21     A. Yes.
22     Q. Do you mean driving without privileges?
23     A. Yes.
24     Q. All right. And do you know what jurisdiction
25 that was?

Page 27

1      MR. EPPINK: Objection; calls for a legal
2  conclusion.
3      THE WITNESS: I'm sorry, I don't know what
4  that means.
5      Q. (BY MR. KANE) Do you know if it was Ada
6  County?
7      A. Oh, yes.
8      Q. All right. And what were the circumstances of
9  that arrest? How did you come to be arrested?
10     MR. EPPINK: Objection; calls for a legal
11 conclusion and form.
12     THE WITNESS: I was driving, I got pulled over
13 and arrested.
14     Q. (BY MR. KANE) Were you -- did you ever have a
15 driver's license before that date?
16     A. Yes.
17     Q. How did you come to lose your privileges?
18     MR. EPPINK: Objection; calls for a legal
19 conclusion.
20     THE WITNESS: I don't recall at this time
21 exactly how it was.
22     Q. (BY MR. KANE) Well, there's several ways to
23 happen. One of them is a DUI. Did you have that?
24     A. No.
25     Q. Another is a lot of unpaid fines for traffic

Page 28

1  violations. Do you remember if that was the case?
2      A. I don't believe so. I -- it may have been a
3  no insurance ticket.
4      Q. Okay. You had been given a ticket for no
5  insurance, and you got pulled over because you hadn't
6  gotten insurance?
7      MR. EPPINK: Objection; form, calls for
8  speculation.
9      THE WITNESS: I'm not -- I don't recall why
10 he -- they had pulled me over, but I believe that's why
11 it was suspended.
12     Q. (BY MR. KANE) Okay. So you were actually
13 arrested on that day?
14     A. Yes.
15     Q. And you were put in handcuffs?
16     A. Yes.
17     Q. And you were taken to jail?
18     A. Yes.
19     Q. What jail was that?
20     A. Ada County.
21     Q. And what year would that have been?
22     A. I was 18, so 2006, I believe.
23     Q. Okay. All right.
24     So what happened on that? Did you stay in
25 jail for a while? Did you get released?

Page 29

8 (Pages 26 - 29)

Page 86

1    Q. And you can't tell me who?
2    A. Correct.
3    Q. Anything else?
4    A. No.
5       MR. EPPINK: Objection; form to the last
6    question.
7    Q. (BY MR. KANE) Okay. Let's get to June of
8    2022. You were protesting there on the Capitol steps on
9    that day; is that fair?
10   A. Yes.
11   Q. Before this day, had you engaged in protests
12   on the Capitol steps before?
13   A. Yes.
14   Q. Can you tell me how many times?
15   A. Probably 50.
16   Q. 5-0?
17   A. Yes.
18   Q. Over how long a period of time?
19   A. My entire life.
20   Q. Okay. Now, you, on this date, came with a
21   certain frame of mind, frame of reference; is that
22   correct?
23      MR. EPPINK: Objection; form.
24   Q. (BY MR. KANE) You were proabortion; correct?
25   A. Yes.

Page 87

1    Q. All right. But these other 49 times, 50 times
2    were not always about abortion, were they?
3    A. Correct.
4    Q. What were they about?
5       MR. EPPINK: Objection; form.
6       THE WITNESS: Human rights, most of the
7    protests that I attend are about human rights in some
8    shape or form.
9    Q. (BY MR. KANE) You're protesting for human
10   rights?
11   A. Correct.
12   Q. Other than abortion issues what else?
13   A. I've protested about housing homeless. I've
14   been -- I've done it so many times I don't -- I can't
15   recall exactly what I've gone out for. Most of it is
16   about helping the community, human rights. I've done
17   Black Lives Matter protests. I've done Pride protests.
18   Many things.
19   Q. Yeah. There was a -- yeah, of course, I can't
20   find it now. I'll find it eventually.
21      But there was a flier that was posted previous
22   to June 28th inviting people to protest?
23   A. Uh-huh.
24   Q. Did you see that?
25   A. Yes.

Page 88

1    Q. Did you author it?
2    A. No.
3    Q. Do you know who did?
4    A. Yes.
5    Q. Who?
6    A. Destinee Brooks.
7    Q. Who is that?
8    A. A friend of mine.
9    Q. Did you participate in drafting this document?
10   A. No.
11   Q. But you knew about it?
12   A. Yes.
13   Q. All right. Did you encourage your friend to
14   do this?
15   A. Yes.
16   Q. Tell me about that.
17      MR. EPPINK: Objection; form.
18   Q. (BY MR. KANE) How did you go about
19   encouraging your friend?
20   A. We had had a conversation about possibly going
21   out. We knew that a pro-life event was happening, and I
22   said, "Well, make a flier." And she made a flier, and
23   posted it, and then I posted it after her. I took it
24   off her Instagram, I believe, her Instagram page.
25      (Exhibit 8 marked.)

Page 89

1    Q. (BY MR. KANE) Okay. I'm going to find it if
2    it kills me. And, of course, I'm not doing it. Let me
3    look in this stack here. It's Exhibit No. 8.
4       So do you recognize Exhibit No. 8?
5    A. Yes.
6    Q. This is the flier that you encouraged your
7    friend to post?
8    A. Yes.
9    Q. And then you reposted it?
10   A. Yes.
11   Q. All right. Who is "wechooselove"? Who are
12   they?
13   A. That's Destinee's Instagram. And I know that
14   she runs the Instagram. But "wechooselove" was a group
15   of people that had met up in the community and do
16   potlucks and other community events.
17   Q. Destinee who?
18   A. Brooks.
19   Q. So are you friends with Destinee Brooks?
20   A. Yes.
21   Q. All right. So you and Destinee worked
22   together to organize this protest; is that fair?
23   A. Yes.
24   Q. Who else did you work with?
25   A. Just myself and Destinee, and then we worked

23 (Pages 86 - 89)

1    Q. (BY MR. KANE)  And have you reviewed the
2  various videos of this protest?
3        MR. EPPINK:  Objection; form.
4        THE WITNESS:  Yes.
5    Q. (BY MR. KANE)  And have you seen the behavior
6  of these people that were protesting?
7    A. I've seen the --
8        MR. EPPINK:  Objection; form.
9        THE WITNESS:  -- behavior on both sides, yes.
10    Q. (BY MR. KANE)  And do you agree with the way
11  that the protesters were behaving?
12        MR. EPPINK:  Objection; form.
13        THE WITNESS:  No.
14    Q. (BY MR. KANE)  They were using foul language,
15  weren't they?
16    A. On both sides, yes.
17    Q. They were yelling loudly; correct?
18    A. Yes.
19    Q. And they were trying to shout the people that
20  were speaking down, weren't they?
21    A. I wouldn't -- I cannot say that that's what
22  they're intentionally doing, but, yes, that was
23  happening.
24    Q. And they were carrying signs?
25    A. Yes.

Page 94

1    Q. (BY MR. KANE)  Correct?
2    A. I'm sorry, I didn't --
3    Q. Like flipping people off?
4        MR. EPPINK:  Objection to form.
5        THE WITNESS:  I didn't see that, so I don't
6  know.
7    Q. (BY MR. KANE)  You never saw that?
8    A. No.
9    Q. All right.  So you came with a certain frame
10  of mind you were going to counter this group; correct?
11    A. Yes.
12    Q. All right.  How were you personally going to
13  counter them?
14    A. I personally was there handing out waters and
15  food, giving other people the opportunity to voice their
16  opinions.
17    Q. Well, that's not all you did, is it?
18    A. No.
19    Q. How were you going to counter, you personally,
20  how were you going to do that?
21        MR. EPPINK:  Objection; asked and answered.
22        THE WITNESS:  I had shown up with a sign, and
23  that was -- my intention wasn't to threaten or harm
24  anybody.  My intention was to also be heard.
25    Q. (BY MR. KANE)  Okay.  And you yelled loudly at

Page 96

1    Q. And some of those signs had foul language;
2  isn't that true?
3    A. Yes.
4    Q. And you, yourself, had a sign?
5    A. I did.
6    Q. What did that sign say?
7    A. I don't recall exactly what it said.
8    Q. Give me an approximation.
9    A. I believe my sign said, "You're pro-life until
10  your child is gay, bi, black, Mexican"; I believe that's
11  the sign that I had.
12    Q. Is what bi -- ganged, did you say?
13    A. Gay.
14    Q. Gagged?
15    A. Gay.  Gay.
16    Q. Say it again.  I didn't catch it?
17    A. Gay.
18    Q. All right.  Is that the best you can do about
19  what your sign said?
20    A. I believe that's what it said.
21    Q. These people were making physical gestures
22  that most people would be considered obscene or
23  fighting?
24        MR. EPPINK:  Objection; form.  Who are you
25  talking about?

Page 95

1  times; correct?
2    A. I did.
3    Q. So that the people speaking could not be
4  heard?
5    A. Correct.
6    Q. You're not entitled to an opinion; is that
7  your impression?
8        MR. EPPINK:  Objection; form.
9        THE WITNESS:  No.
10    Q. (BY MR. KANE)  Go to page 2 of your complaint,
11  if you would.  Now, you see the picture there?
12    A. Yes.
13    Q. It's a hot day --
14    A. Yes.
15    Q. -- correct?
16        People are in shorts?  Yes?
17    A. Yes.
18    Q. Tank tops?
19    A. Yes.
20    Q. Short-sleeved shirts?
21    A. Yes.
22    Q. The second sentence, "Four days after the
23  decision was announced"; do you see that?
24    A. Yes.
25    Q. We're talking about the Dobbs Decision here;

Page 97

25 (Pages 94 - 97)

1     Q.  Did you talk to her at all about the event
2  before it happened?
3     A.  We had planned it together.  We planned on
4  showing up.
5     Q.  What was the plan?
6     A.  The plan was that we would show up at the
7  time -- so I'm going to look at this again.  We planned
8  to show up, we planned the time, which was 6:00 p.m.,
9  and we planned to -- Destinee had planned to make this
10  flier to put up on Instagram.  And I agreed.
11     MR. EPPINK:  The witness is looking at
12  Exhibit 8.
13     MR. KANE:  It's 12:20.  Did you want to break
14  now?  It's probably a good time as any.
15     MR. EPPINK:  If this is a good stopping place,
16  we can place a lunch order.
17     MR. KANE:  Yeah, I think so.  Yeah.
18     Now, you want to just eat now -- let's go off
19  the record.
20     VIDEOGRAPHER:  Going off the record.  The time
21  is 12:20.
22     (Break taken.)
23     VIDEOGRAPHER:  Going back on the record.  The
24  time is 12:33.
25     MR. KANE:  Are we good?  All right.

1  being a very hot day, people were in shorts, tank tops,
2  T-shirts.
3     Did you see anybody else dressed in a blazer
4  that day?
5     A.  Not that I recall, no.
6     Q.  In fact, there was nobody else that you saw
7  that looked remotely dressed that way --
8     MR. EPPINK:  Objection; form.
9     Q.  (BY MR. KANE)  -- isn't that correct?
10     A.  No, it's not correct.
11     Q.  Who else?
12     A.  There were speakers that were dressed --
13     Q.  Uh-huh.
14     A.  -- in nicer clothes.
15     Q.  Okay.  But nobody else with a blazer; correct?
16     A.  Correct.
17     Q.  All right.
18     All right.  We are now -- hopefully, we can
19  make this work.  I'm going to show you a video.
20     A.  Okay.
21     Q.  A portion of a video.  So let's take a moment,
22  and every time I do this it wants to go to sleep on me.
23  And this is not the one, so let's get to this one.
24     Now -- come on -- you and your lawyers have
25  given us a video, and it's called "YouTube video"?

1     Q.  (BY MR. KANE)  I want to ask you a question.
2  I want to talk more about your discovery response.
3     Do you remember narrating what happened on the
4  day and giving it to us in writing under oath?
5     A.  Yes.
6     Q.  Okay.  One of the questions I wanted to ask
7  you, and I'm just going to read it to you.  It's only a
8  single sentence.  "While I was handing out water and
9  snacks I noticed the person I later learned to be
10  Michael Kish.  He was talking with antiabortion
11  protesters so much that I assumed he was with them."
12     Do you remember saying that?
13     A.  Yes.
14     Q.  Okay.  In the previous 50 or so protests that
15  you had been at on the Capitol steps, you never saw Mike
16  Kish before, ever?
17     A.  Not that I recall.
18     Q.  So as far as you know this is the first time?
19     A.  Yes.
20     Q.  And you assumed he was with the proabortion
21  people?
22     A.  Yes.
23     Q.  Or was he with the Proud Boys?
24     A.  With the proabortion people.
25     Q.  All right.  Now, we already talked about this

1     A.  Yes.
2     Q.  And I'm not going to play the whole thing
3  because we'd be here all day.
4     A.  Yes.
5     Q.  But I want to begin by asking you, where did
6  you get this video?
7     A.  Off of YouTube.
8     Q.  And did you just make a copy of it?  Did you
9  do this yourself?
10     A.  I did not make the video, no.
11     Q.  No, did you get it off YouTube yourself?
12     A.  I believe so.
13     Q.  Okay.  And did you give it to your lawyers?
14     A.  Yes.
15     Q.  All right.  Did you make any changes to it
16  before you --
17     A.  No.
18     Q.  All right.  So for the record, I'm going to go
19  to what is called "YouTube video," and I'm going to go
20  at about seven minutes in.  All right?
21     A.  Okay.
22     Q.  And I realize you didn't make this video?
23     A.  [Witness nods head.]
24     Q.  All right.  And there may be some slop here.
25  All right.  That's just --

1    Q. And what was she yelling at you, and what were
2  you yelling back at her?
3    A. She was yelling "fat bitch," "I'll beat your
4  ass," something along the lines of "look at that fat
5  bitch."
6       And I was yelling back, "Okay, bring it, beat
7  my ass."
8    Q. That is it? Uh-huh. All right.
9    A. Something along those lines.
10   Q. Okay. You were -- you're saying you're each
11 threatening each other?
12   A. Yes.
13   Q. And were you doing it loudly?
14   A. Yes.
15   Q. And do you think other people around you
16 believed you were offering to fight with Cin Alfonso?
17      MR. EPPINK: Objection; calls for a legal
18 conclusion.
19      THE WITNESS: I don't know what other people
20 believed.
21   Q. (BY MR. KANE) Well, is it reasonable for
22 someone watching you to believe that you were offering
23 to fight Cin Alfonso?
24      MR. EPPINK: Objection; calls for a legal
25 conclusion.

Page 126

1    THE WITNESS: Yes.
2    Q. (BY MR. KANE) Because you were, you were
3  offering to fight Cin Alfonso, were you not?
4    A. Yes.
5    Q. You were going to attack Cin Alfonso, were you
6  not?
7    A. No.
8    Q. You go on in your statement: "At the same
9  time I was also trying to make my way around the person
10 I later learned to be Michael Kish. As I was doing
11 this, a woman state trooper pushed me back in the chest,
12 and I stumbled a little and started being pulled back
13 into the crowd."
14      Okay. That's your version of the event?
15   A. Yes.
16   Q. Now, you weren't trying to make your way
17 around him. You were trying to bull your way past him
18 so you could attack Cin Alfonso, were you not?
19   A. No.
20   Q. All right. I'm going to switch videos here.
21 And I am now going to go to another video that you and
22 your attorneys have supplied us in discovery. And I'll
23 pull it up.
24      (Video being played.)
25   Q. (BY MR. KANE) Now, I've got the volume off

Page 127

1  here.
2       Do you recognize this video?
3    A. Yes.
4       MR. EPPINK: Mike, can we identify the video?
5       MR. KANE: Yeah. So this is called "Video
6  July 12th-2."
7    Q. (BY MR. KANE) Is this looking familiar to
8  you?
9    A. Yes.
10   Q. You've seen this before?
11   A. Yes.
12   Q. Where did this come from?
13   A. I believe this is off of Facebook live stream.
14   Q. Okay. Did you, yourself, get it?
15   A. Yes.
16   Q. All right. I managed to turn the volume off,
17 and now I can't figure out how to get it back on. Let's
18 see if it's on. No, of course, it's not. And I'm
19 hitting volume, and it's showing 100 percent.
20      MR. DeROIN: Go down to your --
21      MR. KANE: There, I've got the little "X" on
22 it. All right. Thank you. I'm glad someone knows what
23 they're doing.
24      (Video being played.)
25   Q. (BY MR. KANE) All right. So you've seen this

Page 128

1  before, and you know where you got it?
2    A. Yes.
3    Q. Is it not true that this is actually Cin
4  Alfonso's video that she took with her cell phone?
5    A. Yes.
6    Q. You believe that?
7    A. Yes.
8    Q. All right. Okay. So I'm going to go in 4
9  minutes and 30 seconds into this video.
10      (Video being played.)
11   Q. (BY MR. KANE) All right. Now, this is you in
12 the middle of the screen; right?
13   A. Yes.
14   Q. All right. Let's back up just a little bit so
15 there's no mistaking what we're talking about here. I'm
16 at 4 minutes and 21 seconds.
17      (Video being played.)
18   Q. (BY MR. KANE) Now, you see Mike Kish saying
19 to everyone "Back up," his arms spread?
20   A. Correct.
21      MR. EPPINK: Objection; form.
22   Q. (BY MR. KANE) And you're still asserting you
23 had no clue that he's a police officer?
24   A. Correct.
25   Q. All right.

Page 129

33 (Pages 126 - 129)

1  hear any other words?
2      A. I do. I hear myself say, "Is it that bitch?"
3      Q. All right. You called a person a "bitch," did
4  you not?
5      A. Yes.
6      Q. It was at that moment when Cin Alfonso called
7  you a "fat-ass bitch"?
8      A. Yes.
9      Q. Would you agree you started this problem?
10     A. No.
11     Q. Even seeing that?
12     A. Correct.
13     Q. All right. Let's go a little further.
14        (Video being played.)
15     Q. (BY MR. KANE) You lost control of yourself,
16  did you not?
17     A. Yes.
18     Q. What were you yelling at Cin Alfonso?
19     A. "Beat my ass."
20     Q. You said that to her?
21     A. Yeah.
22     Q. And what else were you saying?
23     A. "I don't give a fuck."
24     Q. Okay. Anything else?
25     A. I believe that's it.

Page 134

1      Q. You are literally closing with her while
2  you're yelling this, aren't you?
3      A. Yes.
4      Q. And you had to push past into Mike Kish, did
5  you not?
6      A. Yes. I don't believe I --
7      Q. What were you doing?
8      A. I was approaching Cin.
9      Q. To do what?
10     A. To approach Cin.
11     Q. To do what?
12     A. To have a confrontation with her.
13     Q. To fight with her?
14     A. No.
15     Q. To beat her ass?
16     A. No.
17     Q. You were saying these things to have a private
18  conversation?
19     A. No.
20     Q. Well, what were you doing?
21     A. To intimidate her.
22     Q. Okay. You were challenging her?
23     A. Yes.
24     Q. All right.
25        (Video being played.)

Page 135

1      Q. (BY MR. KANE) You see the woman in red there?
2      A. Yes.
3      Q. And you're saying that when you pointed at
4  her, you pointed in that direction, you weren't singling
5  her out as a bitch?
6      A. I was pointing at that kid with the glasses.
7      Q. Oh, that's the bitch?
8      A. Yes.
9      Q. All right. Okay.
10        (Video being played.)
11     Q. (BY MR. KANE) All right. You just yelled
12  something. After you had been separated, you just
13  yelled something at Cin Alfonso. What was it?
14     A. I know -- I don't know exactly what I said,
15  but I did hear myself say, "You stupid cunt."
16     Q. Would you like me to play it again and listen
17  to it better?
18     A. No, that's okay.
19     Q. All right. You called her a "stupid cunt"?
20     A. Yes.
21     Q. All right. Okay. Now, I'm breaking this up
22  so much, I might just pull it back just a few seconds
23  here.
24        (Video being played.)
25     Q. (BY MR. KANE) All right. Obviously, you're

Page 136

1  having a shouting match. You're each threatening each
2  other and yelling at each other; correct?
3      A. Correct.
4      Q. Mike Kish is in between you?
5      A. Yes.
6      Q. You just saw you move rapidly into Mike Kish?
7      A. Past Mike Kish, yes.
8      Q. You actually connected with him on the
9  shoulder with your shoulder, did you not?
10     A. No.
11     Q. You don't think you connected with him?
12     A. No.
13        (Video being played.)
14     Q. (BY MR. KANE) For all intents and purposes,
15  that's the whole event with Cin Alfonso, isn't it?
16     A. Yes.
17     Q. All right. Which began when you pointed at
18  someone and said, "That's the bitch" --
19        MR. EPPINK: Objection; asked and answered.
20     Q. (BY MR. KANE) -- correct?
21     A. No.
22     Q. You said the word "bitch"?
23     A. Yes.
24     Q. You got called a "bitch"?
25     A. Yes.

Page 137

35 (Pages 134 - 137)

Avalon Hardy March 19, 2024

1    Q.  You didn't like that?
2    A.  Correct.
3    Q.  All right.  So what's the difference?  You can
4  say it, but somebody else can't?
5        MR. EPPINK:  Objection; form.
6        THE WITNESS:  No, it didn't begin there.
7    Q.  (BY MR. KANE)  When did it begin?
8    A.  Previous events.
9    Q.  All right.  We'll talk about previous events,
10  but I'm talking -- let's stick with this one.
11    A.  Uh-huh.
12    Q.  I realize that you probably had a history.
13  We'll talk about it, because you told the media this?
14    A.  Yes.
15    Q.  But I want to stick with this right now.  You
16  were yelling obscenities --
17    A.  Yes.
18    Q.  -- correct?  Because somebody called you a
19  "bitch"?
20    A.  Yes.
21    Q.  But you had just used that term?
22    A.  Yes.
23    Q.  So could you not handle the fact that somebody
24  called you a "bitch"?
25    A.  I can.

Page 138

1    Q.  But you chose not to on this occasion?
2    A.  It wasn't that specific -- it wasn't only for
3  that reason.
4    Q.  All right.  Well, then what else was it?
5    A.  That we had also had a history together.
6    Q.  Well, all right.  Let's get to it.  What is
7  your history with Cin Alfonso that would have led you to
8  behave like this?
9    A.  Cin has targeted me at other protests, pointed
10  me out to police, flashed her gun at me, followed me
11  places.  It's been an ongoing thing since 20 -- probably
12  about 2020, 2021.  And she's yelled at me, called me a
13  "fat bitch," called me a "beast," told me multiple times
14  she's going to beat my ass.  I think what escalated to
15  at this event was that somebody had actually gotten hit
16  prior to that, prior to me showing up, and I had seen it
17  happen.  And I feel like that's where it kind of
18  escalated at, is that somebody had actually gotten hit
19  and nothing was happening.  And then on top of that
20  Cin -- seeing Cin, I'm already mad.  I already knew that
21  she was there.  I was already upset, so I feel like
22  that's where it escalated it to me being more angry.
23    Q.  And do you feel that your conduct was
24  appropriate?
25    A.  No.

Page 139

1    Q.  Do you feel that your conduct was reasonable?
2        MR. EPPINK:  Objection; calls for a legal
3  conclusion.
4        THE WITNESS:  To a certain extent.
5    Q.  (BY MR. KANE)  Okay.  Let's kind of break down
6  what I think you just said.  You said there were various
7  times when Cin Alfonso called you names previous to this
8  day.
9    A.  Correct.
10    Q.  I think that's what I heard you say.  Did you
11  report any of these incidents to the police?
12    A.  No.
13    Q.  Why not?
14    A.  Because they wouldn't do anything.
15    Q.  You just knew that just because?
16    A.  It's not against the law to call somebody a
17  name.
18    Q.  But you didn't feel threatened enough that she
19  was going to get violent with you or stalking you?
20    A.  I did, but, again, I don't have a lot of faith
21  in the legal system, so...
22    Q.  Okay.
23    A.  And I couldn't prove that to -- that she was
24  stalking me.
25    Q.  All right.  So I think you said something

Page 140

1  about you saw somebody else get hit.  Who's that?
2    A.  The person that's next to me that I had
3  pointed out and that I had said "Is it that bitch," they
4  had gotten hit.
5    Q.  And you don't know who that person was?
6    A.  I don't.
7    Q.  You physically saw the guy with the long hair
8  hit somebody?
9    A.  Yes.
10    Q.  Were there any cops there at the time?
11    A.  Yes.
12    Q.  Was Mike Kish there at that time?
13    A.  I believe he was walking up at that time.
14    Q.  All right.  And you surmise that he must have
15  seen it and did nothing?
16    A.  I know that the uniformed officer saw it and
17  did nothing.
18    Q.  Male or female uniformed officer?
19    A.  Female.
20    Q.  That woman we saw in the video?
21    A.  Yes.
22    Q.  She saw somebody hit the person standing next
23  to you?
24    A.  Yes.
25    Q.  Was this a minute before?

Page 141

36 (Pages 138 - 141)

Avalon Hardy March 19, 2024

| | |
|---|---|
| 1 | A. A few seconds. |
| 2 | Q. Ten minutes? A few seconds? |
| 3 | A. Yeah. It's not very -- it's not very much -- |
| 4 | Q. All right. |
| 5 | A. -- before. |
| 6 | Q. All right. |
| 7 | A. I'm sorry, my alarm is going off. |
| 8 | Q. Oh, I'm sorry. |
| 9 | MR. DeROIN: I don't know the time -- |
| 10 | MR. KANE: Does it mean your food is here? |
| 11 | MR. DeROIN: It might be about -- I'm just |
| 12 | noting it's 1:06, so... |
| 13 | THE WITNESS: Yeah. |
| 14 | MR. KANE: Are we good? Good to go? |
| 15 | THE WITNESS: Yeah. |
| 16 | Q. (BY MR. KANE) All right. Let me get back to |
| 17 | that video again. I want to ask you one more question. |
| 18 | (Video being played.) |
| 19 | Q. (BY MR. KANE) I want to get -- I want to see |
| 20 | if I can identify a certain person. |
| 21 | (Video being played.) |
| 22 | MR. KANE: I'm sorry, I pulled the trigger on |
| 23 | that. |
| 24 | (Video being played.) |
| 25 | Q. (BY MR. KANE) The woman in the red hat, is |

Page 142

| | |
|---|---|
| 1 | Q. (BY MR. KANE) Let's say 6 minutes and 43 |
| 2 | seconds in. |
| 3 | Now, this is the YouTube video; right? |
| 4 | A. Yes. |
| 5 | Q. And you've seen this before? |
| 6 | A. Yes. |
| 7 | Q. All right. Now, you -- you'll see it in a |
| 8 | minute, but you know that this video only shows part of |
| 9 | the encounter we just saw; correct? |
| 10 | A. Yes. |
| 11 | Q. In fact, it's already underway when the video |
| 12 | cuts to it; correct? |
| 13 | A. Yes. |
| 14 | Q. All right. |
| 15 | (Video being played.) |
| 16 | Q. (BY MR. KANE) Is the woman in the hat with |
| 17 | the red hair, is that Cin Alfonso? |
| 18 | A. Yes. |
| 19 | Q. This is the person that you had the history |
| 20 | with? |
| 21 | A. Yes. |
| 22 | Q. Okay. |
| 23 | (Video being played.) |
| 24 | Q. (BY MR. KANE) All right. That's where you |
| 25 | dropped your sign; right? |

Page 144

| | |
|---|---|
| 1 | that Destinee Brooks? All I can see is the top of the |
| 2 | red hat. But do you want me to play it back again? |
| 3 | A. I believe that's Destinee. |
| 4 | Q. All right. Why is she there? Was she there |
| 5 | to intervene on your behalf? |
| 6 | MR. EPPINK: Objection; calls for speculation. |
| 7 | THE WITNESS: I have no idea. |
| 8 | Q. (BY MR. KANE) All right. Take a look at what |
| 9 | you're doing there. You're still calling out Cin |
| 10 | Alfonso, are you not? |
| 11 | A. Yes. |
| 12 | (Video being played.) |
| 13 | Q. (BY MR. KANE) All right. That's when you |
| 14 | called her a "cunt"; right? |
| 15 | A. Yes. |
| 16 | Q. All right. Okay. I'm going back now to the |
| 17 | YouTube. And for the record, I am going to go to 6 |
| 18 | minutes and 50 seconds. |
| 19 | (Video being played.) |
| 20 | COURT REPORTER: I didn't hear completely. |
| 21 | MR. KANE: I know. |
| 22 | COURT REPORTER: 6 minutes and 50 -- |
| 23 | MR. KANE: I'll fix it for you. |
| 24 | COURT REPORTER: Okay. |
| 25 | (Video being played.) |

Page 143

| | |
|---|---|
| 1 | A. Yes. |
| 2 | Q. Would you agree, now looking at this, that Cin |
| 3 | Alfonso was not close enough to you to have kicked you? |
| 4 | A. Yes. |
| 5 | Q. All right. |
| 6 | (Video being played.) |
| 7 | Q. (BY MR. KANE) All right. Let's stop there. |
| 8 | A couple of things to break down here. What are you |
| 9 | saying to Mike Kish? |
| 10 | A. I'm not speaking to Mike; I'm speaking over |
| 11 | him to Cin. |
| 12 | Q. What are you saying? |
| 13 | A. "Fuck you." |
| 14 | Q. To who? |
| 15 | A. To Cin. |
| 16 | Q. You see how you're pushing against him? |
| 17 | A. I did not push against him. |
| 18 | Q. Do you want me to show you again? |
| 19 | A. Yes. |
| 20 | (Video being played.) |
| 21 | Q. (BY MR. KANE) All right. You're saying you |
| 22 | did not push against the two of them right there? You |
| 23 | just saw it. |
| 24 | A. Yes, I see that now. |
| 25 | Q. With your chest? |

Page 145

37 (Pages 142 - 145)

Avalon Hardy March 19, 2024

| | |
|---|---|
| 1 | A. Yes. |
| 2 | Q. Waving your hands around? |
| 3 | A. Yes. |
| 4 | Q. While screaming curses? |
| 5 | A. Yes. |
| 6 | Q. All right. |
| 7 | (Video being played.) |
| 8 | Q. (BY MR. KANE) You just said "fuck you" to |
| 9 | Mike Kish, didn't you? |
| 10 | A. No. |
| 11 | Q. You're denying that? |
| 12 | A. I'm not speaking to Kish, I'm speaking over |
| 13 | him, to Cin. |
| 14 | (Video being played.) |
| 15 | Q. (BY MR. KANE) He told you, "If you don't stop |
| 16 | pushing me, you're going to go to jail," didn't he? |
| 17 | A. I hear that now. I didn't -- I wasn't |
| 18 | listening to what he was saying at the time. |
| 19 | Q. Because you were, like, in code black, you |
| 20 | were totally -- you'd lost control of yourself; correct? |
| 21 | MR. EPPINK: Objection; form. |
| 22 | THE WITNESS: I would say that I wasn't |
| 23 | listening to him because I was already encountering with |
| 24 | somebody else. |
| 25 | Q. (BY MR. KANE) You lost control of yourself? |

Page 146

| | |
|---|---|
| 1 | A. No, I didn't lose control. |
| 2 | (Video being played.) |
| 3 | Q. (BY MR. KANE) Now, there's still more |
| 4 | shouting coming from you. I couldn't make out anything. |
| 5 | Do you know what you were saying right then? |
| 6 | A. I don't. |
| 7 | Q. But you knew you were shouting? |
| 8 | A. Yes. |
| 9 | Q. That high voice is yours? |
| 10 | A. Yes. |
| 11 | Q. All right. Again, directed towards Cin? |
| 12 | A. Yes. |
| 13 | Q. All right. |
| 14 | (Video being played.) |
| 15 | Q. (BY MR. KANE) All right. Right there. You |
| 16 | weren't making -- did you see that? You were drinking. |
| 17 | Do you want me to play that again? |
| 18 | A. Please. |
| 19 | Q. I'm sorry. That's on me. |
| 20 | (Video being played.) |
| 21 | Q. (BY MR. KANE) Do you now agree that you hit |
| 22 | him with your shoulder? |
| 23 | A. I agree that I bumped into him. |
| 24 | Q. Yeah. And you were moving fast; correct? |
| 25 | A. Sure. |

Page 147

| | |
|---|---|
| 1 | Q. Would you agree that to an outsider that would |
| 2 | look like you body-checked him? |
| 3 | MR. EPPINK: Objection; calls for speculation. |
| 4 | THE WITNESS: No. |
| 5 | Q. (BY MR. KANE) Would it look like you drove |
| 6 | your shoulder into him? |
| 7 | MR. EPPINK: Objection; calls for speculation. |
| 8 | THE WITNESS: No. |
| 9 | Q. (BY MR. KANE) Well, what do you think it was? |
| 10 | A. It looks like I bumped him. |
| 11 | Q. Okay. And would someone observing that know |
| 12 | that it was accidental? |
| 13 | MR. EPPINK: The same objection. |
| 14 | THE WITNESS: Yes. |
| 15 | Q. (BY MR. KANE) How would they know that? |
| 16 | A. Because you can tell that I'm not trying to |
| 17 | confront him. |
| 18 | Q. You're trying to confront Cin? |
| 19 | A. Correct. |
| 20 | Q. Mike just happened to be in the way? |
| 21 | A. Correct. |
| 22 | Q. You were going to get past him? |
| 23 | A. Yes. |
| 24 | Q. To do what? |
| 25 | A. To confront Cin. |

Page 148

| | |
|---|---|
| 1 | Q. How? |
| 2 | A. Well, verbally; I wasn't going to hit her. |
| 3 | Q. And people looking at you would know that |
| 4 | somehow? |
| 5 | A. I don't know what other people know. |
| 6 | Q. All right. |
| 7 | (Video being played.) |
| 8 | Q. (BY MR. KANE) Now, you see all these people |
| 9 | that are now -- you're being pulled back; correct? |
| 10 | A. Yes. |
| 11 | Q. Do you know any of these people? |
| 12 | A. Not in that -- I know the white hat. |
| 13 | Q. Who is that? |
| 14 | A. Steven. |
| 15 | Q. And that's -- I've got my arrow here? |
| 16 | A. Yes. |
| 17 | Q. Steven who? |
| 18 | A. I don't know his last name. |
| 19 | Q. Is he a friend of yours? |
| 20 | A. I know him, yes. |
| 21 | Q. All right. So did you list him as a witness? |
| 22 | A. No. |
| 23 | Q. All right. I notice people are pulling you |
| 24 | back, physically pulling you back; is that correct? |
| 25 | A. At this point, no. I'm walking backwards but |

Page 149

38 (Pages 146 - 149)

1  there taking notes?
2      A. Yes.
3      Q. And there's Destinee?
4      A. Yes.
5      Q. All right. And you're telling me that you had
6  no information at that point that you were going to get
7  arrested?
8      A. Correct.
9      Q. Now, stop. So you -- you're saying that there
10  was no information at all that you were going to be
11  arrested prior to that time?
12      A. Correct.
13      Q. All right. Let's pull this back a little and
14  get the sound back.
15      (Video being played.)
16      Q. (BY MR. KANE) Now, you see your lips moving,
17  you're saying something. Do you know what you're saying
18  at that point?
19      A. I believe I'm asking why I'm being arrested.
20      Q. Were you calling over your shoulder for
21  someone?
22      A. I was calling to my mom to call my partner.
23      Q. Okay.
24      (Video being played.)
25      Q. (BY MR. KANE) All right. Let's stop there.

Page 158

1      MR. EPPINK: Objection; compound, form.
2      Q. (BY MR. KANE) -- if you understand the
3  difference?
4      A. I don't know how many people had hit me. I
5  did get hit more than once.
6      Q. All right. Tell me about that.
7      A. I got hit in -- sorry -- I got hit in my ribs.
8  I don't know who did it. I'm, again, assuming that it
9  was the antiabortion protesters, and I got hit twice.
10      Q. How far apart?
11      A. Seconds.
12      Q. Okay. When in this scheme of things did you
13  get hit?
14      A. As I'm being arrested.
15      Q. While you're physically being arrested?
16      A. Yes.
17      Q. Or as you leave -- because this says, "while
18  officers were parading me through." So which is it?
19      A. As I'm being arrested.
20      Q. The moment you're being arrested people are
21  hitting you?
22      A. I got hit, yes.
23      Q. All right. Show me where on this video, if
24  you can, where you're being hit and by whom?
25      (Video being played.)

Page 160

1  What are you doing? Why are you doing that?
2      MR. EPPINK: Object to the form.
3      Q. (BY MR. KANE) Is there a reason you were
4  yelling loudly and yelling "fuck you" and you were with
5  the big boys now?
6      A. Because I was angry.
7      Q. Were you trying to attract attention to
8  yourself?
9      A. Attention was already on me.
10      Q. Were you pulling away from the officers?
11      A. No.
12      Q. All right. I want to go back. I'm going to
13  turn the sound off so we don't have to hear it again.
14  But I do have some questions about this.
15      MR. DeROIN: I don't think that was the
16  volume, Mike.
17      MR. KANE: Oh, no? No, you're right. What
18  did I do the light. You're right. All right. Here we
19  go. All right. Let's pull this back again.
20      Q. (BY MR. KANE) Now, before we play this part
21  again, you have said, "I was bruised in the ribs from
22  being hit by antiabortion protesters, plural."
23      Does that mean you were hit by more than one
24  protesters, or does that mean you were hit more than
25  once by a protester --

Page 159

1      THE WITNESS: If you back up just a little
2  bit.
3      (Video being played.)
4      THE WITNESS: About right there is where I get
5  hit.
6      Q. (BY MR. KANE) Where?
7      A. I got hit in my rib. I'll have you pause it.
8  Pause.
9      Q. All right.
10      A. So just before that.
11      Q. You're saying -- who hit you, the guy in the
12  blue hat?
13      A. I don't know who hit me. I just felt it.
14      Q. What side were you hit on?
15      A. On my right side.
16      Q. So you're hit right there, that's one time?
17      A. Back up just a little bit. I was hit twice in
18  a matter of seconds.
19      (Video being played.)
20      THE WITNESS: So just before it pulls up to me
21  and the officer has his arm on my chest -- on my chest,
22  just before that. About there.
23      Q. (BY MR. KANE) Okay. Well, I'm not seeing
24  anybody actually do that. The only person other than this
25  police officers that's around you is Destinee and this

Page 161

41 (Pages 158 - 161)

1  fellow in the blue hat.
2      A. Yes.
3      Q. Are you accusing this fellow in the blue hat
4  of hitting you?
5      A. I don't know if he hit me. I know that I got
6  hit.
7      Q. Well, can you see anyone else in this
8  photograph that could have -- in this video that could
9  have done that?
10     A. No.
11     Q. Okay. He's holding a cell phone, is he not?
12     A. Yes.
13     Q. While he's hitting you, maybe?
14     A. He has two hands, yes.
15     Q. He's holding a cell phone in both hands, is he
16  not?
17     A. Yes.
18     Q. So what happened?
19     A. I don't know. All I know is that I got hit.
20     Q. You know this?
21     A. Yes.
22     Q. Did you say anything to anybody?
23     A. Who am I going to say that to?
24     Q. The police, "Hey, he just hit me"?
25     A. Why would I do that? They're arresting me for

1  something that they can't tell me what they're arresting
2  me for.
3      Q. Why wouldn't you if you were being hit by
4  somebody?
5          MR. EPPINK: Objection; argumentative.
6      Q. (BY MR. KANE) The truth is you never told
7  anybody at any time that you had been hit, especially as
8  to having been bruised; isn't that correct?
9          MR. EPPINK: Objection; form.
10         THE WITNESS: No, that's not correct.
11     Q. (BY MR. KANE) When did you do that first?
12     A. I spoke to my mother.
13     Q. When?
14     A. The day after I got released.
15     Q. The day after?
16     A. Yes.
17     Q. All right. You never mentioned this, being
18  hit, anywhere in the complaint, did you?
19     A. No.
20     Q. Nor did you mention it on television when you
21  were being interviewed on TV; correct?
22     A. Correct.
23     Q. Only later during discovery, months into the
24  event, do you come up with this thing about being hit
25  for the first time; right?

1          MR. EPPINK: Objection; form, asked and
2  answered.
3          THE WITNESS: On paper, yes. But I did
4  tell -- I spoke to my mom about it.
5      Q. (BY MR. KANE) All right. So without
6  belaboring this, looking at that picture, there's a
7  fellow in a blue hat with both hands on his cell phone,
8  anybody else close enough to you, from what you saw,
9  that could have hit you?
10     A. No, just the officers.
11     Q. And do you believe an officer hit you?
12     A. Could have.
13     Q. Why would they do that?
14     A. I don't know why they would.
15     Q. All right. I'm going to go to some body cams
16  from the various police officers that are around you.
17  And we'll walk through them.
18         The first one is video X60A4416J. This is a
19  police bodycam from Boise City that we received. And
20  for the record, I'm going to go to 28 minutes in on this
21  particular video. Now, I'm leaving the sound off for
22  now.
23         (Video being played.)
24     Q. (BY MR. KANE) That's Destinee; right?
25     A. Yes.

1      Q. Any idea who that woman in the hat is that's
2  talking to her?
3      A. No.
4      Q. Now, as we're watching here, does anybody else
5  hit you at any time?
6          MR. EPPINK: Objection; form.
7      Q. (BY MR. KANE) Does anybody else hit you?
8      A. No.
9          MR. EPPINK: Objection; form.
10         THE WITNESS: No.
11     Q. (BY MR. KANE) All right. Now you talked
12  about them parading you through, this was the group;
13  right?
14     A. Yes.
15     Q. Anybody come near you?
16     A. No.
17     Q. All right. I think that's all I got on that
18  one.
19         Now, I'm going to show you another video.
20  This is X60A46385, which didn't copy for some reason, so
21  I guess I won't show it to you. Let me see what else
22  I've got here.
23         MR. EPPINK: And, Mike, could -- it would be
24  helpful if you could also read the numbers before the
25  "X" because there are multiple videos in the discovery

Avalon Hardy March 19, 2024

1 production --
2        MR. KANE:  Yeah.
3        MR. EPPINK:  -- from these various "X"
4 numbers.
5        MR. KANE:  Okay.
6        MR. DeROIN:  And if I may, at least the four
7 that precede the "X."  So like this one that's
8 highlighted as 1842 --
9        MR. KANE:  Fine.  Yeah.
10        MR. DeROIN:  -- that translates to the start
11 time --
12        MR. KANE:  All right.
13        MR. DeROIN:  -- so that helps us identify it.
14        MR. KANE:  Okay.
15     Q.  (BY MR. KANE)  I'm going to show you --
16        MR. KANE:  I need to take a break.  We need to
17 stop for a minute.  A couple of these videos did not
18 copy properly.  I'm going to have to go downstairs, do
19 it on another, and I'll be back in about five minutes.
20 Okay, let's take a break.
21        MR. EPPINK:  Okay.
22        MR. DeROIN:  Okay.
23        VIDEOGRAPHER:  Going off the record.  The time
24 is 2:24.
25        (Break taken.)

Page 166

1        VIDEOGRAPHER:  Going back on the record.  The
2 time is 2:34.
3     Q.  (BY MR. KANE)  So when I made these videos,
4 they're of your complete arrest, and I didn't know until
5 you said right now that the time you were hit was in --
6 during that few moments you were actually being
7 handcuffed; is that fair?
8     A.  Yes.
9     Q.  So we'll see what else we have on these other
10 videos of the arrest and see if they show that.  And for
11 the record, you were not hit any other time, you're
12 saying?
13     A.  Correct.
14     Q.  Are you saying that my officers knew that you
15 were hit?
16     A.  I don't know what they knew.
17     Q.  You're not suggesting that we let it happen,
18 then?
19     A.  I don't know.
20        MR. KANE:  All right.  And as we're doing
21 this, let's stop.  You want the full number?
22        MR. DeROIN:  At least the four numbers before
23 the X; that will give us the timestamp.
24        MR. KANE:  All right.  It's
25 2022-06-281842X60A46385.

Page 167

1        MR. DeROIN:  Yeah.  And I don't mean to be
2 pedantic, but like just the 1842 --
3        MR. KANE:  Okay.
4        MR. DeROIN:  -- is all we need, and then the
5 last four that --
6        MR. KANE:  Okay.
7        MR. DeROIN:  -- that X6 number, that's the
8 serial number of that one.
9     Q.  (BY MR. KANE)  All right.  And this one, for
10 the record, I'm showing it at 2830.
11        (Video being played.)
12     Q.  (BY MR. KANE)  All right.  I'm going to leave
13 the sound off on this one, too.  All right.  Let's see
14 what we have here on this one.
15        (Video being played.)
16     Q.  (BY MR. KANE)  All right.  You see where that
17 guy was with the blue hat --
18     A.  Yep.
19     Q.  -- facing away from you?  Now, he's -- see
20 what he's doing?
21     A.  Yes.
22     Q.  Got both hands on his cell; right?
23     A.  Yes.
24     Q.  All right.  If that gentleman didn't hit you,
25 can you think of anybody else around you that would have

Page 168

1 hit you?
2     A.  The only other people that are around me are
3 the police officers.
4     Q.  All right.  So are you suggesting a police
5 officer hit you?
6     A.  Possibly.
7     Q.  Hit you how?
8     A.  I don't know.
9     Q.  Are we talking a punch?
10     A.  I don't know.
11     Q.  Are we talking a slap?
12     A.  No.
13     Q.  Are you sure you were hit at all?
14     A.  I'm sure I was hit.  I felt it.
15     Q.  All right.  And it wouldn't have been while
16 you were trying to pull away from the officers?
17     A.  I was never pulling away from the officers.
18     Q.  Well, you saw yourself yelling and pulling
19 away when you were being handcuffed, were you not?
20        MR. EPPINK:  Objection; form, argumentative.
21        THE WITNESS:  No.  I was never pulling away
22 from the officers.
23     Q.  (BY MR. KANE)  Okay.  Other than these -- this
24 group of police officers and the one guy with both hands
25 on his cell, can you think of anyone else that would

Page 169

43 (Pages 166 - 169)

1 have hit you?
2    A. No.
3    Q. All right. And I have one more that may or
4 may not give us a better view. Let's take a look here.
5 This is -- let's get this on the record -- this is
6 1844X60A4729D, and about a minute in. This one got
7 corrupted, I don't know. All right. Okay.
8      I don't know what happened there.
9      Okay. Did you go to the doctor's upon your
10 ribs being bruised?
11    A. No.
12    Q. Did you seek any medical professional of any
13 kind to talk about your ribs being bruised?
14    A. No.
15    Q. The blow was hard enough, though, to actually,
16 physically, bruise your ribs?
17    A. Yes.
18    Q. Are you talking your skin or the bones
19 themselves?
20    A. The skin.
21    Q. All right. And did you show anybody these
22 bruises?
23    A. My mother.
24    Q. And when was that?
25    A. The day after I was released.

Page 170

1    Q. Okay. Describe these bruises, if you would.
2    A. They were small, in a circular pattern,
3 there's three of them.
4    Q. Okay. Small, what, the size of?
5    A. About a half-inch.
6    Q. All right. Three bruises a half-inch?
7    A. Yes.
8    Q. And did you actually feel this hit, or did you
9 surmise later that you had been hit?
10    A. I felt the hit.
11    Q. Okay. And, yet, you have no explanation of
12 who might have done that?
13    A. Correct.
14    Q. Did you take any pictures of those bruises?
15    A. I did not.
16    Q. If I understood your discovery response, it
17 sounds like you were saying you were unable to work
18 because of these bruised ribs; is that true?
19    A. No, not my ribs, my wrists.
20    Q. All right. All right. Let's do this, then.
21      All right. You've given us three photos of
22 your arms, and I'm going to bring them each up, and
23 we're going to talk about what we're seeing here.
24    A. Okay.
25    Q. Okay. All right. This -- do you want me to

Page 171

1 identify this one for you? This is from you
2 2022069223925. And you disclosed this in discovery.
3      So tell me what we're looking at here.
4    A. I have a small circular -- two small circular
5 bruises just above my tattoo on my forearm.
6    Q. All right. Is this your right arm or your
7 left arm?
8    A. My left arm.
9    Q. All right. So can I see your tattoo now,
10 please.
11    A. [Witness complied.]
12    Q. So would you say that is about 3 or 4 inches
13 above your actual wrist where it meets the hand?
14    A. About.
15    Q. Approximately. And that's another inch or two
16 above that?
17    A. Yes.
18    Q. And I'm seeing what could be two; is that
19 right?
20    A. Yes.
21    Q. Both about the size of maybe a dime?
22    A. Yes.
23    Q. And are you saying that was caused by the
24 handcuffs?
25    A. I don't believe it's the handcuffs. I believe

Page 172

1 it's a hand grabbing me.
2    Q. Ah, okay. So while you were being handcuffed
3 your arms were being held?
4    A. Correct.
5    Q. And you think that a hand did that?
6    A. Yes.
7    Q. All right. Is that the bruises that kept you
8 from working?
9    A. No.
10    Q. Okay. So this arm is okay?
11    A. I mean, my wrist is what was hurting, but that
12 is a bruise --
13    Q. Okay.
14    A. -- on my arm.
15    Q. So this doesn't purport to show any injury to
16 your wrist?
17    A. Not that photo, no.
18    Q. Okay. All right. Then we're going to go to
19 20220629223931. And you tell me what we're looking at
20 here.
21      All right. The same arm?
22    A. Yes.
23    Q. What are we looking at here?
24    A. That's my wrist, and it's slightly swollen,
25 and there's some bruising. The picture you can't really

Page 173

Veritext Legal Solutions
Calendar-Idaho@veritext.com    208-343-4004

1 see it very well, but there's a little bit of bruising
2 there.
3     Q.  And you say it's slightly swollen?
4     A.  Yes.
5     Q.  And are you saying that's from the handcuffs?
6     A.  Yes.
7     Q.  Now, are you saying that's when the handcuffs
8 were put on or some time later?
9         MR. EPPINK:  Objection; form.
10     Q.  (BY MR. KANE)  Or do you even know?
11     A.  I don't know when that was caused.
12     Q.  Are you saying they were too tight?
13     A.  They were not comfortable.
14     Q.  Okay.  Well, that's probably true.  But were
15 they too tight, is my question?
16     A.  To cause bruising, yes, and swelling, yes.
17     Q.  And is this the reason you couldn't work?
18     A.  Yes.
19     Q.  Because of what we're seeing on that picture
20 right there?
21     A.  Yes.
22     Q.  On your left arm?
23     A.  Yes.
24     Q.  How long were you unable to work?
25     A.  I didn't take clients for the rest of that

Page 174

1 week.
2     Q.  Three days?
3     A.  So Tuesday, Wednesday, Thursday, Friday,
4 Saturday.  I didn't go back to work until Sunday.
5     Q.  Okay.  And you normally work on weekends?
6     A.  Yes.
7     Q.  At this time?
8     A.  Yes.
9     Q.  All right.
10     A.  When I'm not in a boot, yes.
11     Q.  Did you see any medical professionals about
12 this problem?
13     A.  No.
14     Q.  Why not?
15     A.  Because I didn't.
16     Q.  Weren't you a little worried if you were
17 unable to work because of your bruised wrist?
18     A.  I was, but I just didn't seek medical
19 attention for it, no.
20     Q.  All right.  Let's go to this last one.  This
21 is 20220629223940.
22         And what are we looking at here?
23     A.  It's my right wrist -- my right wrist, sorry.
24     Q.  What are we seeing here?
25     A.  It's a little bit swollen.  There's some

Page 175

1 bruising there also.
2     Q.  Where's the bruise?
3     A.  Just underneath my thumb, right at my wrist.
4     Q.  All right.  Did you seek any medical attention
5 as to this?
6     A.  No.
7     Q.  And you're saying you couldn't work -- was it
8 four days --
9     A.  Yes.
10     Q.  -- as a result of this?
11     A.  Yes.
12     Q.  All right.  Other than -- well, did you show
13 these bruises to anyone else?
14     A.  My mother.
15     Q.  So on your left arm you say that the bruise on
16 your wrist was caused by the handcuffs?
17     A.  I believe so, yes.
18     Q.  And is it because they were too tight?
19     A.  I believe that they weren't on correctly.
20 They were tight enough to cause bruising.
21     Q.  Say that again?
22     A.  I believe that they weren't on correctly, and
23 they were tight enough to cause bruising.
24     Q.  Okay.  Do you realize that you are on camera
25 saying that on your left hand that the cuffs were loose?

Page 176

1     A.  Is that before?
2     Q.  No, it's after.
3     A.  So --
4     Q.  Do you remember making that statement?
5     A.  I remember them adjusting the cuff for me,
6 yes.
7     Q.  Because they were too loose?
8     A.  My left hand was loose, yeah.
9     Q.  So what are you saying, it was only later when
10 they were adjusted they were too tight?
11     A.  Yes.
12     Q.  You realize that was by a Boise PD officer?
13     A.  I don't know who did it.
14     Q.  Well, I'll show you.  I hope.  Let's see if I
15 can find it.  All right.  Oh, I forgot to identify this.
16 Let's do it now.  This is 1911X60A49707.
17         Now, for the record, this is your transporting
18 officer's video.
19     A.  Okay.
20     Q.  All right.  I'm going to go to 21 minutes in.
21 I'll just start -- I'm starting at 20:27.  Oops, wait.
22 I've got to get the volume back.  And we'll see if we're
23 there.
24         (Video being played.)
25     Q.  (BY MR. KANE)  So is this when they were put

Page 177

45 (Pages 174 - 177)

Avalon Hardy March 19, 2024

1 on too tightly?
2    A. No. I asked him to adjust it because it was
3 sliding down and hitting my knuckles.
4    Q. Yeah.
5    A. So on my wrist it was hitting my thumb knuckle
6 on my wrist, so...
7    Q. But you did hear you say, "can you tighten
8 it"; right?
9    A. Yes.
10    Q. That's not what caused the bruise, you're
11 saying?
12    A. No.
13    Q. It was earlier?
14    A. No. I'm saying that the cuffs caused the
15 bruise. I don't know if it was because it was too -- I
16 don't -- obviously, it wasn't too tight; it was sliding
17 down and hitting my knuckles on my hands.
18    Q. So show me what you're talking about.
19    A. [Demonstrating.] So this part here, it was
20 hitting that on my hand.
21    Q. Okay. Okay. So --
22    A. So I asked him to --
23    Q. -- because it was rubbing against your hand --
24    A. Yes.
25    Q. -- you were not able to work for three or four
                                            Page 178

1 days?
2    A. Yeah.
3    Q. Did you ever have that happen before at any
4 other time you were handcuffed?
5    A. No.
6    Q. All right. Let's talk about your physical
7 injuries. I think you've already said that you have
8 not -- you saw no doctors at all?
9    A. Correct.
10    Q. Ever?
11    A. Correct.
12       MR. EPPINK: Objection.
13    Q. (BY MR. KANE) In any way that could verify
14 these injuries; correct?
15    A. Correct.
16    Q. All right. What about your mental health?
17 You had depression before; did it get worse as a result
18 of this arrest?
19    A. I think that my anxiety levels that contribute
20 to depression did.
21    Q. All right. And did you seek any help from any
22 mental health professional at any time after this
23 arrest?
24    A. No.
25    Q. Why not?
                                            Page 179

1    A. Because I haven't.
2    Q. So you don't have a medical professional who
3 can make any sort of diagnosis as to what your anxiety
4 or depression was after this arrest; is that fair?
5    A. Yes.
6    Q. Okay. All right. I want to now go to your
7 interview with the Idaho Statesman that was on the net.
8    A. Okay.
9    Q. And do you know if that was on television as
10 well?
11    A. I don't recall.
12    Q. All right. Now, this, of course, is after the
13 judge acquitted you?
14    A. Yes.
15    Q. How did that actually happen? How did it come
16 about that you sat for an interview with the media about
17 this?
18    A. I believe that the reporter reached out to my
19 attorney, Ryan Black, and Ryan asked if I wanted to do
20 an interview.
21    Q. All right. So you didn't seek out the media?
22    A. No.
23    Q. How did the reporter even know about this
24 misdemeanor case?
25       MR. EPPINK: Objection; calls for speculation.
                                            Page 180

1       THE WITNESS: I'm not sure.
2    Q. (BY MR. KANE) Your understanding is that
3 there was some kind of a conversation with your attorney
4 Ryan Black?
5    A. Yes.
6    Q. You don't know if he reached out to the
7 reporter?
8    A. He did not reach out to the reporter.
9    Q. And how do you know that?
10    A. He told me that she contacted him.
11    Q. All right. Well, let's -- I've got just a
12 couple of questions.
13       First of all, why did you -- why did you go
14 public on this? What was the purpose of that?
15       MR. EPPINK: Objection; form.
16       THE WITNESS: I'm sorry, the purpose of going
17 public for the lawsuit?
18    Q. (BY MR. KANE) No. Why did you go public with
19 the media?
20    A. Because I feel like my story needs to be
21 heard.
22    Q. Okay. You wanted to publicize this event?
23    A. Yes.
24    Q. All right.
25       (Video being played.)
                                            Page 181

46 (Pages 178 - 181)

Avalon Hardy March 19, 2024

| | |
|---|---|
| 1    MR. EPPINK:  Objection; form. | 1    A.  Yes. |
| 2    THE WITNESS:  It depends on the context. | 2    Q.  Are you accusing any of my clients of being |
| 3    Q.  (BY MR. KANE)  The context here is that you | 3  racist? |
| 4  lost control of yourself; correct? | 4    A.  Yes. |
| 5    A.  No. | 5    Q.  Who? |
| 6    Q.  You got very, very angry? | 6    A.  All of them. |
| 7    A.  I did get angry. | 7    Q.  Mike Kish? |
| 8    Q.  And you started screaming back; right? | 8    A.  Yes. |
| 9    A.  Yes. | 9    Q.  You know Mike Kish did not cause your arrest; |
| 10    Q.  But calling somebody else a "bitch" is okay if | 10  right? |
| 11  you do it? | 11    A.  He did have some cause in it. |
| 12    A.  No. | 12    Q.  And how about Troy DeBie -- he wrote the |
| 13    MR. EPPINK:  Objection to form. | 13  police report -- is he a racist, as well? |
| 14    Q.  (BY MR. KANE)  Is that right? | 14    A.  Yes. |
| 15    In this altercation, to use your phrase, was | 15    Q.  Why? |
| 16  there any physical altercation or was it strictly | 16    A.  Why would he single out me, and his actions |
| 17  verbal? | 17  don't speak any different. |
| 18    A.  It was strictly verbal. | 18    Q.  And how about Sam Ketchum, is he a racist |
| 19    Q.  But you were aggressing Cin, weren't you? | 19  also? |
| 20    A.  I was. | 20    A.  Yes. |
| 21    Q.  The only reason you didn't get to her was | 21    Q.  And Steve McClain? |
| 22  because Mike was between you; correct? | 22    A.  Yes. |
| 23    A.  Correct. | 23    Q.  He's one of the officers that arrested you. |
| 24    Q.  And you were pulled back? | 24    A.  Yes. |
| 25    A.  Correct. | 25    Q.  And Kyle Card also is a racist? |
| Page 186 | Page 188 |

| | |
|---|---|
| 1    Q.  Okay.  In your first set of discovery you make | 1    A.  Yes. |
| 2  this -- this is on page 6 -- you make this statement, "I | 2    Q.  How about Danielle Castellanos, is she a |
| 3  was singled out, discriminated against, and retaliated | 3  racist too? |
| 4  against because I am a black woman and because I was | 4    A.  Yes. |
| 5  speaking out and protesting in support of abortion | 5    Q.  Why? |
| 6  access." | 6    A.  She could have intervened and never did and |
| 7    How do you know that you were singled out? | 7  never spoke up for anybody -- |
| 8    MR. EPPINK:  Objection; form. | 8    Q.  Intervened on what? |
| 9    THE WITNESS:  I feel that I was.  There was | 9    A.  -- so yes. |
| 10  other people also pushing up against officers and | 10    Q.  On what? |
| 11  yelling at officers, and I was the only one that got | 11    A.  On the whole incident.  She never took to |
| 12  arrested. | 12  anybody else.  The only words that she said were, "We're |
| 13    Q.  (BY MR. KANE)  Do you see anybody that acted | 13  arresting people for this."  And then I got arrested. |
| 14  as dramatically as you did that day? | 14    Q.  Uh-huh. |
| 15    A.  I did. | 15    A.  I was never told that, but she -- |
| 16    Q.  Who? | 16    Q.  We're arresting people for what? |
| 17    A.  I don't know their names. | 17    A.  That's all she said. |
| 18    Q.  Did you see anybody screaming words like | 18    Q.  You heard her say it to the people yelling at |
| 19  "fuck" and "cunt"? | 19  you; right? |
| 20    A.  Yes, I did. | 20    A.  Yes. |
| 21    Q.  At someone while waving their hand at them? | 21    Q.  Okay.  And, therefore, she's a racist? |
| 22    A.  Yes. | 22    A.  Yes.  She only warned the white people that |
| 23    Q.  And you feel you were singled out? | 23  were there. |
| 24    A.  Yes. | 24    Q.  Well, that's 99 percent of the people there; |
| 25    Q.  Because you're a black woman? | 25  right? |
| Page 187 | Page 189 |

48 (Pages 186 - 189)

1    Q. People are yelling "Jesus."
2        (Video being played.)
3    Q. (BY MR. KANE) All right. You and your mom
4  are actually in the street as these people are trying to
5  walk past; right?
6    A. Yes.
7    Q. What are you doing?
8    A. I was actually already there before they
9  started walking past.
10   Q. Standing in the street?
11   A. Yes.
12   Q. Okay. Well, what are you doing?
13   A. I was standing there. I wasn't talking to
14 anybody. I was standing there. And kind off the screen
15 there's a person that's laying on the ground.
16   Q. Okay. Were you trying to get that person off
17 the ground?
18   A. Yeah. I was trying to get his shoes from him
19 and make sure he didn't get trampled.
20   Q. Okay. So here you are in a crowd?
21   A. Yes.
22   Q. That you put yourself there.
23       (Video being played.)
24   Q. (BY MR. KANE) I'm not seeing you doing what
25 you just said you were doing. I see you standing there.

Page 198

1    A. So it kind of glitched where it was at, but
2  you could see him sitting on the ground just in front of
3  me.
4    Q. Let's back it up a little.
5    A. Yeah.
6        (Video being played.)
7        THE WITNESS: So right there.
8    Q. (BY MR. KANE) So your mother's got something
9  in her hand. What is that?
10   A. A mister.
11   Q. A mixture?
12   A. Mister.
13   Q. A micter [phonetic]?
14   A. Mister.
15   Q. What is that for?
16   A. Like spray bottle.
17   Q. What for?
18   A. It just has water, it's cool water.
19   Q. Okay. I've been told that she was calling it
20 "unholy water"; is that true?
21   A. No.
22   Q. Anyway, in any event, this was an event that
23 you chose to put yourself in, into a large crowd?
24   A. I was standing over somebody, yes.
25   Q. Okay. I'm going to show you some photos that

Page 199

1  we have disclosed in discovery. These are from DeBie
2  taken of you. This is at a Palestinian rally; correct?
3    A. Yes.
4    Q. You were there for this one?
5    A. Yes.
6    Q. When was that?
7    A. I don't remember the date, but I'm going to
8  probably say fall, early fall, maybe.
9    Q. After the -- after Hamas attacked Israel?
10   A. Yes.
11   Q. All right. And this is you; right?
12   A. Yes.
13   Q. Okay. So when you say you're hypersensitive,
14 you're at least sensitive enough to go to these events?
15   A. Yes.
16   Q. What is different about these and any other
17 protest that you have been to?
18   A. Of -- for me?
19   Q. Yeah, for you.
20   A. I feel like in those you can see, especially
21 in the Palestinian one, I'm not with the crowd of
22 people. In the video that you showed, it only shows a
23 slight clip of me standing over somebody trying to
24 protect them. At the same time, in that same video, the
25 woman that's in the hat speaking to Destinee is

Page 200

1  approaching me, yelling at me, also, in that video that
2  you had just showed.
3    Q. Destinee was there for that too, huh?
4    A. Destinee was not there for August, no. But
5  those type of events I try and stay out of the crowd. I
6  try and stay away from them unless I see something, for
7  instance a person laying on the ground while people are
8  walking around. I'm a protective person, I'm going to
9  try and protect that person from getting trampled.
10   Q. Okay. Let's talk about Mike Kish for a
11 minute. Do you understand now that he did not order
12 your arrest?
13   A. Yes.
14   Q. Yet you're suing him anyway?
15   A. Yes.
16   Q. Why?
17   A. Because he participated in it.
18   Q. Participated in what?
19   A. In the whole prosecution process. He was on
20 the stand as a witness. The report is about him --
21   Q. Uh-huh.
22   A. -- so...
23   Q. Yeah. He was a -- listed as a victim, I get
24 that?
25   A. Uh-huh.

Page 201

51 (Pages 198 - 201)

1    Q. And he was -- he testified?
2    A. Yes.
3    Q. Anything else you can think of that he did
4    wrong?
5        MR. EPPINK: Objection; calls for a legal
6    conclusion, and form.
7        THE WITNESS: I feel like he should have
8    represented himself better.
9    Q. (BY MR. KANE) Where?
10    A. At the protest.
11    Q. And how would he have done that?
12    A. Make it known that --
13        MR. EPPINK: Objection; calls for speculation.
14        THE WITNESS: Make it known that he is an
15    officer and that he was there to help.
16    Q. (BY MR. KANE) Well, he did tell you if you
17    don't stop pushing me, you're going to go to jail,
18    didn't he?
19    A. I can tell that to you, that doesn't mean that
20    I'm an officer.
21    Q. I see. Anything else he did wrong?
22        MR. EPPINK: Objection; calls for a legal
23    conclusion.
24        THE WITNESS: Right now that's all I can think
25    of.

Page 202

1    Q. (BY MR. KANE) Yeah. In your complaint, and
2    we can bring it out if you want, there is a lengthy
3    recital from the trial, and it starts on page 13. And
4    for the record, we're on Exhibit 7.
5        You got the picture there?
6    A. Yeah.
7    Q. The question is: "And it looks like your hand
8    here is pressed up against your breast." "I would say
9    no, sir." And it goes on. Are you alleging that Mike
10    Kish intentionally contacted your breast?
11    A. I didn't ask these questions, so I don't know
12    what these are alleging.
13    Q. Okay. Well, it's in your complaint; that's
14    why I was asking.
15        Are you asserting that you were somehow
16    sexually assaulted by Mike Kish?
17    A. I didn't ask these questions --
18    Q. I know.
19    A. -- so I -- it -- his hand is pressed up
20    against my breast.
21    Q. All right.
22    A. That's the facts.
23    Q. But you can see that you're kind of like wild
24    there, right, coming at him?
25        MR. EPPINK: Objection; form.

Page 203

1        THE WITNESS: I am not coming at him, but,
2    yes.
3    Q. (BY MR. KANE) All right. Are you making any
4    allegation about Mike Kish somehow battering you in some
5    way?
6        MR. EPPINK: Objection; calls for a legal
7    conclusion.
8        THE WITNESS: At this point, no.
9    Q. (BY MR. KANE) Do you even know who Captain
10    Sam Ketchum is?
11        MR. EPPINK: Objection; form.
12    Q. (BY MR. KANE) As you sit here right now?
13    A. No.
14    Q. Do you know what role he took in this case?
15    A. I was informed that he ordered the arrest.
16    Q. All right. Do you think, based upon what you
17    saw in those videos that he acted unreasonably by
18    ordering you being arrested?
19        MR. EPPINK: Objection; calls for a legal
20    conclusion.
21        THE WITNESS: I'm sorry, that he acted
22    unreasonably?
23    Q. (BY MR. KANE) Yes.
24    A. Yes.
25    Q. Would you agree that you, in fact, did push

Page 204

1    Mike Kish?
2    A. No.
3        MR. EPPINK: Objection; form.
4    Q. (BY MR. KANE) I'm going to show you a snippet
5    of what we took from the YouTube video.
6        (Video being played.)
7    Q. (BY MR. KANE) Now, you recognize this, right,
8    because you -- we've already shown it to you?
9    A. Yes.
10    Q. I want to --
11        MR. EPPINK: Can you identify the video for
12    the record, Mike?
13        MR. KANE: I'm sorry?
14        MR. EPPINK: Can you identify the video for
15    the record?
16        MR. KANE: This is from the YouTube video.
17    It's a little snippet from the YouTube video.
18    Q. (BY MR. KANE) I'm going to just slow it down
19    and go right back to the beginning. Let me do it at
20    half speed, and just right from the very beginning.
21        (Video being played.)
22    Q. (BY MR. KANE) Now, did you see them both
23    being pushed away from you?
24    A. Yes.
25    Q. And that's because you're pushing your weight

Page 205

52 (Pages 202 - 205)

Avalon Hardy March 19, 2024

1   on the two of them, isn't it?
2       A.  Yes.
3       Q.  Were you, indeed, pushing them with your
4   chest?
5       A.  Yes.
6       Q.  That's what Mike Kish alleged, isn't it?
7       A.  Yes.
8       Q.  Other than Troy DeBie writing a report based
9   upon what he was told, did he do anything to harm you?
10      A.  Other than writing the report?
11      Q.  Yeah.
12      A.  No.
13      Q.  Just the fact that he wrote the report you
14  believe is an actionable event that can get him into
15  court?
16      MR. EPPINK:  Objection; calls for a legal
17  conclusion.
18      THE WITNESS:  Yes.
19      Q.  (BY MR. KANE)  What about Kyle Card and Steve
20  McClain, do you even know how they came to arrest you?
21      A.  No.
22      Q.  Do you know who they talked to or didn't talk
23  to?
24      A.  No.
25      Q.  Other than putting you in handcuffs and
Page 206

1   walking you to the car, did they do anything to abuse
2   you?
3       MR. EPPINK:  Objection; calls for a legal
4   conclusion, and form.
5       THE WITNESS:  All right.  Take the first
6       Q.  (BY MR. KANE)  All right.  Take the first
7   amended complaint and go to page 11.  And this is
8   paragraph 21:  "As they shouted during the protest,
9   Defendant Kish observed protesters and
10  counter-protesters in physical contact with each other,
11  but did not intervene except to hold Ms. Hardy back from
12  others."
13      Do you stand by that statement?
14      A.  Yes.
15      Q.  Why did he have to hold you back from others?
16      MR. EPPINK:  Objection; calls for speculation.
17      THE WITNESS:  Because I was yelling.
18      Q.  (BY MR. KANE)  And pushing him; correct?
19      A.  I didn't push him.  I pushed up against him,
20  but I did not physically push him.
21      Q.  All right.  The next paragraph, "As he did
22  this, he intentionally physically contacted Ms. Hardy."
23      How did he physically contact you?
24      A.  His arm was on me.
25      Q.  Trying to hold you back; correct?
Page 207

1       MR. EPPINK:  Objection; calls for speculation.
2       THE WITNESS:  Yes.
3       Q.  (BY MR. KANE)  All right.  You went to jail,
4   the next morning you got a first appearance; correct?
5       A.  Yes.
6       Q.  All right.  At that point you had a public
7   defender appointed; correct?
8       A.  Yes.
9       Q.  How did it go from a free public defender to
10  another lawyer?  How did that happen?
11      MR. EPPINK:  Objection; form.
12      THE WITNESS:  If I recall, I believe I spoke
13  with Ritchie, and Ritchie said that there was
14  somebody --
15      Q.  (BY MR. KANE)  I don't want to hear about what
16  anybody said; that's called attorney-client privilege.
17      So you don't even know for sure how this other
18  lawyer got involved except what other -- someone told
19  you?
20      A.  No, that's not what I was going to say.
21      Q.  All right.  Go ahead.
22      A.  Ritchie wasn't my attorney at the time.
23      Q.  Okay.  Go ahead.
24      A.  I spoke with Ritchie, and Ritchie said that
25  another attorney was interested in taking my case.
Page 208

1       Q.  Okay.  So that was Ryan Black?
2       A.  Yes.
3       Q.  He was a volunteer?
4       A.  Yes.
5       Q.  All right.  What was the arrangement with the
6   second lawyer?
7       MR. EPPINK:  Objection; form.
8       THE WITNESS:  I don't know what you mean by
9   that.
10      Q.  (BY MR. KANE)  Well, did you sign a contract?
11      A.  I don't -- no, I didn't.
12      Q.  Did you hire him?
13      A.  Yes.
14      Q.  Was it a verbal understanding of some kind?
15      A.  Yes.
16      Q.  What was that understanding.
17      MR. EPPINK:  Objection; calls for
18  privileged -- attorney-client privilege.
19      Q.  (BY MR. KANE)  I'm not going for privileged.
20  I don't want to hear about any attorney-client
21  conversation.
22      You had a verbal arrangement of some kind that
23  he was going to come in for your case; is that right?
24      A.  Yes.
25      Q.  What was that arrangement?
Page 209

53 (Pages 206 - 209)

1    MR. EPPINK: So, Avalon, I'd instruct you not
2  to answer the question to the extent that you have to
3  disclose any communications with Ryan Black. But if you
4  can answer otherwise, I suppose --
5    Q. (BY MR. KANE) Yeah. Did you have any kind of
6  verbal agreement as to how he was going to get paid?
7    A. No.
8    Q. All right. Did you pay Ryan Black any money?
9    A. No.
10    Q. Do you owe Ryan Black any money?
11    A. No.
12    Q. Has anyone filed a lien or a judgment for
13  attorneys' fees against you for his representation?
14    A. No.
15    Q. Is there some agreement of some kind with him
16  for future payment?
17    A. No.
18    Q. He just did this for free?
19    A. Yes.
20    Q. Pro bono?
21    A. Yes.
22    Q. Had you ever met this person before?
23    A. No.
24    Q. All right. On the first amended complaint, if
25  you would go to page 20. And look at paragraph 69:

Page 210

1  "Defendants improperly exerted pressure on the
2  prosecutor, knowingly provided misinformation to the
3  prosecutor, concealed exculpatory evidence, and
4  otherwise engaged in wrongful or bad faith conduct that
5  was actively instrumental in causing the initiation and
6  continuation of legal proceedings against Ms. Hardy."
7    What information do you have to make that
8  allegation?
9    MR. EPPINK: Objection; calls for a legal
10  conclusion.
11    THE WITNESS: I don't know exactly what there
12  is. My attorneys did help me prepare this, so...
13    Q. (BY MR. KANE) I understand. Do you even know
14  if any of the five defendants that you have ever even
15  spoke to the prosecuting attorney about this case?
16    A. I do not.
17    Q. So you don't know whether they exerted any
18  pressure on them?
19    MR. EPPINK: Objection; calls for a legal
20  conclusion, argumentative, and form.
21    THE WITNESS: I, myself, do not know that.
22    Q. (BY MR. KANE) What exculpatory evidence did
23  they conceal?
24    MR. EPPINK: Objection; calls for a legal
25  conclusion.

Page 211

1    THE WITNESS: Again, I'm not sure. My
2  attorneys helped me with this.
3    Q. (BY MR. KANE) Look at paragraph 74:
4  "Defendants" -- that's plural, by the way, it would
5  include everybody here that I am representing --
6  "deliberately fabricated evidence."
7    What evidence did they fabricate?
8    MR. EPPINK: Objection; calls for a legal
9  conclusion.
10    THE WITNESS: The arrest affidavit had false
11  information on it.
12    Q. (BY MR. KANE) All right. That was DeBie that
13  wrote the affidavit; right?
14    A. If I remember correctly, yes.
15    Q. So what about the other four, what did they do
16  to fabricate evidence?
17    MR. EPPINK: Objection; calls for a legal
18  conclusion.
19    THE WITNESS: I'm not sure.
20    Q. (BY MR. KANE) Now, Troy DeBie wrote that
21  affidavit that said you were shoving Mike Kish with your
22  chest and hands; right?
23    A. Yes.
24    Q. You were, weren't you?
25    A. No.

Page 212

1    Q. You certainly were with your chest?
2    A. Yes.
3    Q. We just saw that?
4    A. Yes.
5    Q. So that part was true?
6    A. Yes.
7    Q. Go to the next page 21: "Defendants
8  suppressed evidence" -- this is paragraph 80 --
9  "suppressed evidence that was favorable."
10    What evidence did they suppress?
11    MR. EPPINK: Objection; calls for a legal
12  conclusion.
13    THE WITNESS: Again, I'm not sure what was
14  suppressed.
15    Q. (BY MR. KANE) All right.
16    A. Sorry, do you mind if we take a break?
17    Q. Yeah. You know, that's why I was checking my
18  watch. Let's give you a little break. We're actually
19  getting to the end here, believe it or not.
20    VIDEOGRAPHER: Going off the record. The time
21  is 3:32.
22    (Break taken.)
23    VIDEOGRAPHER: Going back on the record. The
24  time is 3:47.
25    Q. (BY MR. KANE) All right. Just a few more.

Page 213

54 (Pages 210 - 213)

1 Please look at page 22 of your amended complaint,
2 starting with paragraph 86. And you see that this is a
3 claim that the various state police officers violated
4 your right to free speech, assemble, and association.
5     Do you see that?
6     A. Yes.
7     Q. All right. Do you, as you sit here now, after
8 seeing the videos and everything we've been through
9 today, believe you were arrested because you were
10 saying, "My body, my choice"?
11     MR. EPPINK: Objection; form.
12     THE WITNESS: No.
13     Q. (BY MR. KANE) Would you agree that you were
14 arrested because you were yelling at Cin Alfonso?
15     MR. EPPINK: Objection; calls for a legal
16 conclusion.
17     THE WITNESS: Yes.
18     Q. (BY MR. KANE) And do you believe that you
19 were arrested because you were challenging her to fight
20 and using the word "fuck you" to her?
21     MR. EPPINK: Objection; calls for a legal
22 conclusion.
23     THE WITNESS: Yes.
24     Q. (BY MR. KANE) Would you agree with me that if
25 you hadn't done that, no police officer would have

1 bothered you that day?
2     MR. EPPINK: Objection; calls for
3 speculation --
4     THE WITNESS: No.
5     MR. EPPINK: -- and legal conclusion.
6     Q. (BY MR. KANE) You don't believe that?
7     A. No.
8     Q. What do you believe?
9     MR. EPPINK: Objection; form.
10     THE WITNESS: I believe that police officers
11 still would have bothered me or engaged with me at some
12 point during that day.
13     Q. (BY MR. KANE) What do you base that on?
14     A. Previous experiences.
15     Q. Like what?
16     A. They have approached me at other protests and
17 rallies.
18     Q. Not these clients?
19     A. Not specifically these ones, no.
20     Q. Just police officers in general?
21     A. Yes.
22     Q. They approached you?
23     A. Yes.
24     Q. You've listed several potential witnesses in
25 your response to discovery, and I'm just going to walk

1 through some of them. Okay?
2     A. I'm sorry, what page are you on?
3     Q. It's not an exhibit.
4     A. Okay.
5     Q. It's just your discovery response. You've
6 named some potential witnesses. One of them is Sarah
7 Miller, she's from the Statesman?
8     A. Yes.
9     Q. Now, we know that you, obviously, were
10 interviewed by her?
11     A. Yes.
12     Q. Have you spoken to her since the -- that
13 interview?
14     A. No.
15     Q. Do you know if she has any photographs or
16 videos from the incident?
17     A. I do not know what she has.
18     Q. Have you asked her for them?
19     A. No, I have not.
20     Q. You don't know what she has or doesn't have?
21     A. Correct.
22     Q. So as we sit here right now, she may not even
23 know she's been listed as a witness; is that fair?
24     A. Possibly, yes.
25     (Exhibit 10 marked.)

1     Q. (BY MR. KANE) All right. You list Charlene
2 Davis as a witness. And pull up Exhibit No. 10.
3 Hopefully, going to be on the bottom. Got it?
4     A. Yes.
5     Q. So this was your public defender; right?
6     A. Yes.
7     Q. Now, if I look at 10, by July 6th of 2022,
8 Mr. Black had taken over the case; right?
9     A. Yes.
10     Q. So between the 28th to the 6th, take away the
11 weekend and the 4th of July holiday, I think we're
12 talking about four working days, did you actually ever
13 even meet Charlene Davis?
14     A. We spoke on the phone.
15     Q. Okay. Just one time?
16     A. Twice I believe.
17     Q. Twice. All right. Did she file anything on
18 your behalf in court?
19     A. Not that I recall at this time.
20     Q. Does she know anything about this case other
21 than what you might have told her?
22     A. I don't know what she knows.
23     Q. Do you know what she brings to the table as a
24 potential witness?
25     A. I do not.

REPORTER'S CERTIFICATE

1     REPORTER'S CERTIFICATE
2     I, ANDREA L. CHECK, CSR No. 748, Certified
3  Shorthand Reporter, certify;
4     That the foregoing proceedings were taken
5  before me at the time and place therein set forth, at
6  which time the witness was put under oath by me;
7     That the testimony and all objections made
8  were recorded stenographically by me and transcribed by
9  me or under my direction;
10     That the foregoing is a true and correct
11  record of all testimony given, to the best of my
12  ability;
13     I further certify that I am not a relative or
14  employee of any attorney or party, nor am I financially
15  interested in the action.
16     IN WITNESS WHEREOF, I set my hand and seal
17  this 27th day of March, 2024.
18
19
20     _Andrea Check_
21     ANDREA L. CHECK, CSR No. 748, RPR, CRR
22     Notary Public
23     1109 West Main Street, Suite 220
24     Boise, Idaho 83702
25  My Commission expires July 20, 2028.

Page 226

---

1  Hardy v. Kish, Et Al.
2  Avalon Hardy (#6587836)
3     E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Avalon Hardy        Date
25

Page 228

---

1  Richard A. Eppink
2  ritchie@wrest.coop
3     March 27, 2024
4  RE:  Hardy v. Kish, Et Al.
5  3/19/2024, Avalon Hardy (#6587836)
6    The above-referenced transcript is available for
7  review.
8    Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  Calendar-Idaho@veritext.com.
16  Return completed errata within 30 days from
17  receipt of testimony.
18  If the witness fails to do so within the time
19  allotted, the transcript may be used as if signed.
20
21
22    Yours,
23    Veritext Legal Solutions
24
25

Page 227

---

1  Hardy v. Kish, Et Al.
2  Avalon Hardy (#6587836)
3     ACKNOWLEDGEMENT OF DEPONENT
4    I, Avalon Hardy, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11  _____  _____
12  Avalon Hardy        Date
13  *If notary is required
14    SUBSCRIBED AND SWORN TO BEFORE ME THIS
15  _____ DAY OF _____, 20___.
16
17
18  _____
19  NOTARY PUBLIC
20
21
22
23
24
25

Page 229

58 (Pages 226 - 229)

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                  IN AND FOR THE DISTRICT OF IDAHO

 3

 4     AVALON HARDY,                      )

 5             Plaintiff,                 ) Case No. 1:23-cv-00306-BLW

 6     vs.                                )

 7     MICHAEL KISH, CHARLES KETCHUM,     )

 8     TROY DEBIE, KYLE CARD, and         )

 9     STEVEN McCLAIN, in their           )

10     individual capacities, and         )       DEPOSITION OF

11     JOHN/JANE DOES 1-10, other law     )        CASEY PARSONS

12     enforcement officers whose         )     TAKEN MAY 24, 2024

13     true names are unknown, in         )

14     their individual capacities,       )

15             Defendants.                )

16     _____)

17

18

19

20

21     REPORTED BY:

22     ANDREA L. CHECK, CSR No. 748, RPR, CRR

23     Notary Public

24

25

                                                  Page 1
```

Casey Parsons May 24, 2024

1    Q. (BY MR. KANE) Now do you remember the arrest
2  occurring?
3    A. No, I don't actually.
4    Q. So, actually, as you're watching this, you
5  recognize now that she was being arrested?
6    A. Yes.
7    Q. But until you came in here, you didn't even
8  remember that she had been arrested?
9    A. I remembered the fact that she'd been
10  arrested. As you can see in this video, I'm behind,
11  like, several people.
12    Q. Right.
13    A. So I don't remember the specific sequence of
14  events, but I was aware at the time that she was being
15  arrested and that she had been arrested.
16    (Video being played.)
17    Q. (BY MR. KANE) Now, let's just ask you:
18  Avalon Hardy has testified under oath that she was hit
19  in the ribs by antiabortion protesters.
20    Do you remember that happening?
21    A. I don't recall.
22    Q. Now, she's, at different times, said slightly
23  different things. At one time she said she was hit
24  while being, quote, paraded through the protesters.
25    Do you remember seeing that?

Page 10

1    Q. Well, I can show you videos. Maybe I should.
2  Let's do that.
3    Okay. I'm going to show X60A4692D. Great
4  number.
5    And, of course, I pulled the wrong one up, I
6  think. Yeah, I did. No, I think this is the right one.
7  Forgive me, these videos I tend to confabulate them all.
8    (Video being played.)
9    Q. (BY MR. KANE) Yeah, here we are. I'm sorry.
10  So we are, roughly, a minute and a half in on this
11  video.
12    And you see yourself there in that video?
13    A. Yes.
14    Q. And do you see that this is by a Boise Police
15  car, and Avalon Hardy is there?
16    A. It's difficult to make out from this angle
17  exactly what's happening in this video.
18    Q. Yeah, it's not the best, I agree. Let me back
19  up a little.
20    You see you there in the picture between the
21  two officers right there?
22    A. I see someone that could be Avalon, but I'm
23  not sure that I could identify her based on this video.
24    Q. Let me represent to you that I think we can
25  all agree that it was her.

Page 12

1    A. I remember the police, like, I think, bringing
2  her through the crowd, but I think that I was kind of
3  far back from that happening because of the fact that
4  there were, like, so many police involved, and they were
5  moving through a dense crowd of people.
6    Q. How about while she was actually being
7  handcuffed, do you remember her being hit in the ribs by
8  anybody?
9    A. I don't recall.
10    Q. Is there any memory that you have about any
11  statements she might have made about being handcuffed?
12    A. I'm sorry, I don't understand that.
13    Q. Do you remember any statements she made about
14  being handcuffed while you were there observing?
15    A. I don't recall.
16    Q. Just no memory at all?
17    A. Of any statements that she made while being
18  handcuffed?
19    Q. Yes.
20    A. No. But, I mean, again, as you can see, I'm
21  not, like, immediately by her, and I would guess if you
22  played the sound on this, it would be pretty noisy.
23    Q. Yeah, it is. Did you follow her to the police
24  vehicle?
25    A. I don't recall.

Page 11

1    Do you remember her making any statements at
2  that time while you were observing?
3    A. I don't recall at this time.
4    Q. Anything about her ribs being bruised or
5  hurting?
6    Does that refresh your memory at all?
7    A. I don't recall at this time.
8    Q. How about anything about the handcuffs being
9  too tight?
10    A. I don't recall at this time.
11    Q. You just don't have any memory about any of
12  that?
13    A. Yeah. I mean, it was two years ago.
14    Q. Yeah, I understand. And you don't know where
15  your notes went other than Mr. Eppink has them?
16    A. Yeah, I gave them to Mr. Eppink.
17    Q. And you don't even know if they exist anymore?
18    A. I'm assuming that they do, but I wouldn't know
19  either way.
20    Q. Was there anything unusual about this arrest
21  that sticks out in your mind at this time?
22    A. I mean, I guess, mostly based on reviewing the
23  video, it's not obvious to me why she's being arrested.
24    Q. Did you see an event earlier where she had an
25  encounter with a police officer?

Page 13

4 (Pages 10 - 13)

1    A. I'm sorry, I don't understand that question.

2    Q. Earlier in the day before the arrest, did you

3  see an encounter between Avalon Hardy and a police

4  officer?

5    A. Not, like, a specific one that sticks out in

6  my mind, no.

7    Q. Nothing that you can recall?

8    A. I mean, I remember Avalon being at the protest

9  and the police being, at various times, interspersed

10  throughout the protest and, at some point, forming a

11  line between the two groups of protesters.  And so I'm

12  sure I witnessed some kind of interaction between Avalon

13  and the police or any number of the protesters and the

14  police; I just don't have, like, a specific encounter

15  to, like, articulate.

16    Q. Do you know why she was arrested on that day?

17    A. I don't, actually.

18    Q. Do you represent Avalon now?

19    A. Not personally, no.

20    MR. KANE:  All right.  Well, thank you very

21  much.  That was pretty painless.  Appreciate your time.

22    MR. EPPINK:  The witness will read and sign.

23    COURT REPORTER:  Mr. Eppink, do you want

24  copies of the transcripts?

25    MR. EPPINK:  I don't need them at this time.

Page 14

---

1    COURT REPORTER:  Okay.

2    MR. EPPINK:  If I need them later, I'll let

3  you know.

4    MR. KANE:  I will of course, just e-tran.

5

6    (Deposition concluded at 10:18 a.m.)

7    (Signature requested.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 15

---

REPORTER'S CERTIFICATE

1

2    I, ANDREA L. CHECK, CSR No. 748, Certified

3  Shorthand Reporter, certify;

4    That the foregoing proceedings were taken

5  before me at the time and place therein set forth, at

6  which time the witness was put under oath by me;

7    That the testimony and all objections made

8  were recorded stenographically by me and transcribed by

9  me or under my direction;

10    That the foregoing is a true and correct

11  record of all testimony given, to the best of my

12  ability;

13    I further certify that I am not a relative or

14  employee of any attorney or party, nor am I financially

15  interested in the action.

16    IN WITNESS WHEREOF, I set my hand and seal

17  this 30th day of May, 2024.

18

19

20

*Andrea Check*

21    ANDREA L. CHECK, CSR No. 748, RPR, CRR

22    Notary Public

23    1109 West Main Street, Suite 220

24    Boise, Idaho 83702

25  My Commission expires July 20, 2028.

Page 16

---

1  RICHARD A. EPPINK

2  ritchie@wrest.coop

3      May 30, 2024

4  RE:   HARDY v. KISH et al.

5    5/24/2024, CASEY PARSONS (#6711826)

6    The above-referenced transcript is available for

7  review.

8    Within the applicable timeframe, the witness should

9  read the testimony to verify its accuracy. If there are

10  any changes, the witness should note those with the

11  reason, on the attached Errata Sheet.

12    The witness should sign the Acknowledgment of

13  Deponent and Errata and return to the deposing attorney.

14  Copies should be sent to all counsel, and to Veritext at

15  Calendar-Idaho@veritext.com

16

17  Return completed errata within 30 days from

18  receipt of testimony.

19    If the witness fails to do so within the time

20  allotted, the transcript may be used as if signed.

21

22      Yours,

23      Veritext Legal Solutions

24

25

Page 17

---

5 (Pages 14 - 17)

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                IN AND FOR THE DISTRICT OF IDAHO

 3

 4    AVALON HARDY,                    )

 5            Plaintiff,               ) Case No. 1:23-cv-00306-BLW

 6    vs.                             )

 7    MICHAEL KISH, CHARLES KETCHUM,   )

 8    TROY DEBIE, KYLE CARD, and       )

 9    STEVEN McCLAIN, in their         )

10    individual capacities, and       )      DEPOSITION OF

11    JOHN/JANE DOES 1-10, other law   )    MEGAN HARRIGFELD

12    enforcement officers whose       )    TAKEN MAY 24, 2024

13    true names are unknown, in       )

14    their individual capacities,     )

15            Defendants.              )

16    _____)

17

18

19

20

21    REPORTED BY:

22    ANDREA L. CHECK, CSR No. 748, RPR, CRR

23    Notary Public

24

25

                                              Page 1
```

Megan Harrigfeld May 24, 2024

| | |
|---|---|
| 1 uniform? | 1 background? |
| 2     A. It looks like it, from the video. | 2     A. Yes. |
| 3     Q. Yeah. Did you see him do anything improper on | 3     Q. Is that you? |
| 4 that day? | 4     A. No. |
| 5     A. I don't remember. | 5     Q. Well, that makes it a lot easier, then. |
| 6     Q. I stopped him. He's kind of blurry there, but | 6     So do you even know where you were then during |
| 7 you see Avalon right next to him? | 7 this portion -- |
| 8     A. No. | 8     A. No. |
| 9     Q. Holding the sign? | 9     Q. -- of the event. |
| 10     A. Oh, yes. Yeah. | 10     And you know that Avalon was arrested for what |
| 11     (Video being played.) | 11 she was doing here, do you not? |
| 12     Q. (BY MR. KANE) I'm going to go a little | 12     A. I knew Avalon was arrested. I didn't know |
| 13 further here. This will take a moment, but we're going | 13 that this was the exact behavior. |
| 14 to come up on a scene just momentarily. This is not it. | 14     Q. So as you sit here right now, you cannot say |
| 15     Do you see that? | 15 whether or not she battered Mike Kish? |
| 16     A. Yes. | 16     A. No. |
| 17     Q. Let me stop for a moment here. | 17     Q. You cannot say that she did not batter Mike |
| 18     Did you see this happen? | 18 Kish? |
| 19     A. Not from my memory. | 19     A. No, I can't remember. |
| 20     Q. Okay. Do you see the woman in the red hat | 20     Q. All right. The main reason that you're here |
| 21 there? | 21 involves some testimony of Avalon Hardy earlier in this |
| 22     A. Yes. | 22 case involving being bruised in the ribs by protesters. |
| 23     Q. Do you know who that is? | 23     Did you know that before you came here today? |
| 24     A. Yes. | 24     A. No. |
| 25     Q. Who's that? | 25     Q. Well, that's why you're here. |
|             Page 14 |             Page 16 |
| 1     A. Their first name is Destinee. I don't know | 1     Let me read a couple of sentences. These are |
| 2 their last name. | 2 actually from her sworn written testimony in discovery. |
| 3     Q. Was she a legal observer as well? | 3 Okay? |
| 4     A. No. | 4     "I was bruised in the ribs from being hit by |
| 5     Q. She's wearing a very distinctive red hat. | 5 antiabortion protesters while officers were parading me |
| 6     Do you know what that is for? | 6 through them in handcuffs. They walked me through a |
| 7     A. No. | 7 crowd of antiabortion protesters, and the officers let |
| 8     Q. Did you have any conversations with her before | 8 them hit me in the ribs." |
| 9 this event? | 9     Now, did you see that happen? |
| 10     A. Not from my memory. | 10     A. Not from my memory. |
| 11     Q. Any conversations after this event? | 11     Q. I'm going to show you some videos here. And I |
| 12     A. Yeah, I've spoken to Destinee since this | 12 want to see if we can refresh your memory at all. |
| 13 event. | 13     Now, I'm staying on the YouTube video. I'm |
| 14     Q. Do you know what she was doing there that day? | 14 now moving to 17:50, approximately. And I'm going to |
| 15     A. No. | 15 leave the sound off unless you tell me that you think |
| 16     Q. No information at all on her as far as this | 16 you need the sound for some reason. |
| 17 day? | 17     (Video being played.) |
| 18     A. I mean, it appears she's taking part in the | 18     Q. (BY MR. KANE) Let's start right here. This |
| 19 demonstration. | 19 is 17:39 in the YouTube video. Now, this is actually |
| 20     Q. Right. But other than that? | 20 stopped, as you see, but you see two people in green |
| 21     A. No. | 21 hats taking notes. |
| 22     (Video being played.) | 22     Are you in that photo? |
| 23     Q. (BY MR. KANE) I'm going to let this play out | 23     A. Yes. |
| 24 for just another moment here. | 24     Q. Which of the two are you? |
| 25     Do you see that green hat there in the | 25     A. I'm the one more on the left. |
|             Page 15 |             Page 17 |

5 (Pages 14 - 17)

1    Q.  In this picture?
2    A.  Yes.
3    Q.  Closer to Avalon?
4    A.  Yes.
5    Q.  Who in this moment in time has her back to
6    you; correct?
7    A.  Yes.
8    Q.  Out of curiosity, you and Casey Parsons seem
9    to be the only ones wearing masks in this crowd.
10       Was that intentional?  Were you wearing a mask
11   for a reason?
12   A.  Yes.
13   Q.  Which is?
14   A.  Well, we were still in the -- I mean, we still
15   are in the depths of a global pandemic and, also, I like
16   to wear masks sometimes when I'm out.
17   Q.  Were you protecting your identity in any way?
18   A.  That could have been a motivating factor.
19   Q.  Why would that have been?
20   A.  Doxing.
21   Q.  Fair enough.  We live in that kind of a world,
22   don't we?
23   A.  [Witness nods head.]
24   Q.  I'm going to back up just a tad here.  I went
25   maybe a little too far.  I'm going to let this play out,

Page 18

1    and I'm going to leave the sound off because there's a
2    lot of cursing and swearing.
3       (Video being played.)
4    Q.  (BY MR. KANE)  Now, you see the officer
5    speaking to Avalon Hardy and you taking notes there?
6    A.  Yes.
7    Q.  What are they talking about?
8    A.  Oh, I don't remember.
9    Q.  As you sit here right now, no idea what they
10   were saying?
11   A.  No.
12   Q.  But you were taking notes of it?
13   A.  Yes.
14   Q.  Do you still have those notes?
15   A.  No.
16   Q.  Where did they go?
17   A.  I turned them in later that day, and I haven't
18   seen them since.
19   Q.  To who?
20   A.  I believe to Ritchie, either Casey or Ritchie.
21   Q.  So you had a relationship with Ritchie Eppink
22   on that day?
23   A.  I don't remember.
24   Q.  You don't have those notes?
25   A.  No.

Page 19

1    Q.  And you don't know what they're talking about?
2    A.  No.
3    Q.  But if you had those notes, would you be able
4    to refresh your memory?
5    A.  I don't know.
6    Q.  Well, I guess, maybe let's dive into this a
7    little bit.
8       Are you there taking notes about
9    conversations, or are you taking notes about actions?
10   A.  Both.
11   Q.  So it's entirely possible that you might have
12   notes at one time that said the police officer said "X"
13   and Avalon Hardy said "Y"?  You might have that
14   information?
15   A.  No, I don't.  I do not have that information.
16   Q.  At the time you did?
17   A.  It's possible.
18   Q.  If you weren't taking notes about their
19   conversation, what else were you taking notes of?  I
20   mean, you're writing on your pad here.
21   A.  Yeah, your guess is as good as mine.  I mean,
22   I'm legal-observing, so I'm taking notes on what was
23   going on around me.
24   Q.  Were you writing down the names of the police
25   officers?

Page 20

1    A.  I don't remember, but that's likely.
2    Q.  Let's let it play for another moment or two.
3       (Video being played.)
4    Q.  (BY MR. KANE)  Now it pulls away.  You see her
5    being arrested here?
6    A.  Yes.
7    Q.  And you were taking notes during this time;
8    correct?
9    A.  It appears so from the video.
10   Q.  Yeah.  Anything you remember, as you sit here
11   right now, about the arrest?
12   A.  No.
13   Q.  Nothing?
14   A.  No.
15   Q.  Was there anything in your observations about
16   this event that led you to believe that Avalon Hardy was
17   in physical danger?
18   A.  I don't remember.
19   Q.  Let's let it play for a moment or two.
20       (Video being played.)
21   Q.  (BY MR. KANE)  Now we can play the sound if
22   you want, but do you remember her acting this way?
23   A.  No, I don't --
24       MR. EPPINK:  Objection; form.
25   Q.  (BY MR. KANE)  You don't?

Page 21

6 (Pages 18 - 21)

Megan Harrigfeld May 24, 2024

1    A. No, I don't remember this event much.

2    Q. Well, let's let it play for another few
3 minutes here. And, again, I'm going to leave the sound
4 off, but if you want the sound, you tell me. All right?

5        (Video being played.)

6    Q. (BY MR. KANE) Now, is it fair to say that you
7 were there and took notes during the entire time that
8 she was being handcuffed and led to the police car?

9    A. Oh, I don't remember. The video looks like I
10 was there for, certainly, part of it.

11    Q. And at any time did you see her get hit in the
12 ribs by anybody?

13    A. I don't remember.

14    Q. Well, that would be something that would be
15 memorable, wouldn't it, if somebody attacked her?
16 You'd probably remember that, wouldn't you?

17    A. No, not necessarily.

18    Q. Oh, really?

19        Let me ask you this question: Did Avalon
20 Hardy ever make any statements, to your memory, that her
21 handcuffs were too tight?

22    A. To me?

23    Q. To anyone while you were there?

24    A. Oh, not from my memory.

25    Q. I'm going to show you another video here. And

Page 22

1    Q. There you are.

2    A. Yeah.

3    Q. Now, during this time period while she's being
4 readied to be put in the police car, do you remember her
5 saying anything about her handcuffs being too tight?

6    A. I don't remember.

7    Q. Her saying anything about being hit in the
8 ribs?

9    A. I don't remember. Do these videos have audio?

10    Q. They do. And I'll represent to you she
11 doesn't say it, but I was curious if you remembered
12 something?

13    A. No, not from my memory.

14    Q. All right.

15        (Video being played.)

16    Q. (BY MR. KANE) Was there anything unusual
17 about this arrest that sticks in your mind?

18    A. The only thing unusual I would say was during
19 the entirety of the action it seemed like all of the law
20 enforcement that was present were -- they were all only
21 facing the proabortion protesters.

22    Q. That's during the arrest?

23    A. During the action, so I guess...

24    Q. And what did you draw from that?

25    A. That it appeared that the police were more

Page 24

1 for the record -- let's see if I can do this right here.
2 I can never get this to work right. This is going to be
3 X60A4692D. And let's see if I can pick the right one.

4        MR. EPPINK: Can you say that again?

5        MR. KANE: Yes. Give me a second to see if I
6 got the right one. X60A4692D.

7        (Video being played.)

8    Q. (BY MR. KANE) This is a short video taken by
9 a Boise police officer.

10        And you see him walking up on you two;
11 correct?

12    A. Yes.

13    Q. Now, let me stop. At her deposition, Avalon
14 Hardy says, under oath, that she was hit in the ribs
15 during the handcuffing.

16        Did you see that happen?

17    A. Not from my memory.

18        (Video being played.)

19    Q. (BY MR. KANE) As she walks through the crowd
20 here, does anything refresh your memory about her being
21 hit in the ribs?

22    A. No.

23    Q. Were you following behind her?

24    A. I don't remember exactly, but I think so. Oh,
25 yes.

Page 23

1 concerned with surveilling the proabortion protesters
2 than the antiabortion protesters.

3    Q. And do you think there might have been a
4 reason for that?

5    A. I don't know what their reason would have
6 been.

7    Q. Were the proabortion protesters more loud?

8    A. No.

9    Q. Were they more vulgar?

10    A. No.

11    Q. Anything else about the arrest itself that you
12 found unusual or something that stuck in your mind?

13    A. Not from my memory.

14    Q. Do you have any information, as you sit here
15 right now, that Avalon Hardy was wrongfully arrested?

16    A. Any information?

17    Q. Yeah.

18    A. No.

19    Q. Did you attend the trial?

20    A. No.

21        MR. KANE: That's all I've got. Thank you.

22        THE WITNESS: Yeah.

23        MR. EPPINK: The witness will read and sign.

24        (Deposition concluded at 9:27 a.m.)

25        (Signature requested.)

Page 25

7 (Pages 22 - 25)

REPORTER'S CERTIFICATE

1   REPORTER'S CERTIFICATE
2       I, ANDREA L. CHECK, CSR No. 748, Certified
3   Shorthand Reporter, certify;
4       That the foregoing proceedings were taken
5   before me at the time and place therein set forth, at
6   which time the witness was put under oath by me;
7       That the testimony and all objections made
8   were recorded stenographically by me and transcribed by
9   me or under my direction;
10      That the foregoing is a true and correct
11  record of all testimony given, to the best of my
12  ability;
13      I further certify that I am not a relative or
14  employee of any attorney or party, nor am I financially
15  interested in the action.
16      IN WITNESS WHEREOF, I set my hand and seal
17  this 30th day of May, 2024.
18
19
20
21      *Andrea Check*
        ANDREA L. CHECK, CSR No. 748, RPR, CRR
22      Notary Public
23      1109 West Main Street, Suite 220
24      Boise, Idaho 83702
25  My Commission expires July 20, 2028.

Page 26

---

1   HARDY v. KISH et al.
2   MEGAN HARRIGFELD(#6711826)
3           E R R A T A  S H E E T
4   PAGE_____ LINE_____ CHANGE_____
5   _____
6   REASON_____
7   PAGE_____ LINE_____ CHANGE_____
8   _____
9   REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  MEGAN HARRIGFELD              Date
25

Page 28

---

1   RICHARD A. EPPINK
2   ritchie@wrest.coop
3       May 30, 2024
4   RE:   HARDY v. KISH et al.
5       5/24/2024, MEGAN HARRIGFELD(#6711826)
6       The above-referenced transcript is available for
7   review.
8       Within the applicable timeframe, the witness should
9   read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12      The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  Calendar-Idaho@veritext.com
16
17  Return completed errata within 30 days from
18  receipt of testimony.
19    If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22      Yours,
23      Veritext Legal Solutions
24
25

Page 27

---

1   HARDY v. KISH et al.
2   MEGAN HARRIGFELD(#6711826)
3       ACKNOWLEDGEMENT OF DEPONENT
4       I, MEGAN HARRIGFELD, do hereby declare that I
5   have read the foregoing transcript, I have made any
6   corrections, additions, or changes I deemed necessary as
7   noted above to be appended hereto, and that the same is
8   a true, correct and complete transcript of the testimony
9   given by me.
10
11  _____  _____
12  MEGAN HARRIGFELD              Date
13  *If notary is required
14      SUBSCRIBED AND SWORN TO BEFORE ME THIS
15      _____ DAY OF _____, 20___.
16
17
18      _____
19      NOTARY PUBLIC
20
21
22
23
24
25

Page 29

Destinee Brooks June 11, 2024

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                IN AND FOR THE DISTRICT OF IDAHO
 3
 4
    AVALON HARDY,                    )
 5                                   )
            Plaintiff,               )
 6                                   )
    vs.                             )    Case No.
 7                                  )    1:23-CV-003006-BLW
    MICHAEL KISH, CHARLES           )
 8  KETCHUM, TROY DEBIE, KYLE       )
    CARD, and STEVEN McCLAIN, in    )
 9  their individual capacities,    )
    and JOHN/JANE DOES 1-10,        )
10  other law enforcement           )
    officers whose true names       )
11  are unknown, in their           )
    individual capacities,          )
12                                  )
            Defendants.             )
13                                  )
14
15
16
17
18              DEPOSITION OF DESTINEE BROOKS
19
                      June 11, 2024
20
                      Boise, Idaho
21
22
23
24
    Reported by:
25  Misti L. Alcalde, ID CSR #1137, CA CSR #13338, RPR


                                          Page 1
```

Destinee Brooks June 11, 2024

**Page 34**

1  speaking to a Boise police officer. Do you
2  remember what that conversation was?
3     A. I believe I was asking why is she being
4  arrested.
5     Q. Alright.
6       Anything else?
7     A. I believe I repeatedly asked why is she
8  being arrested.
9     Q. Alright.
10      Let's play it.
11      (Video playing.)
12    Q. BY MR. KANE: Is that you there?
13    A. In the frame, that's correct.
14    Q. So is it fair to say that what you did
15 was you circled around from Avalon's left to her
16 right side?
17    A. From what we just saw?
18    Q. Yeah.
19    A. Yes.
20    Q. That's what you did. You were on her
21 right side; correct?
22    A. I was on her left side.
23    Q. Her right side. You went from her left
24 to her right.
25    A. We were facing this way. I was on this

**Page 35**

1  side, which is the left, and circled to the right.
2     Q. Right. Okay.
3       Did anything unusual happen that you saw
4  that you remember during that event?
5     A. I remember the officers pushing me.
6     Q. Uh-huh.
7       And anything else?
8     A. I remember asking repeatedly why is she
9  being arrested and no one answered me.
10    Q. Anything else?
11    A. That's mostly what happened from what I
12 can remember.
13    Q. Do you remember anybody hitting Avalon
14 Hardy?
15    A. Do I remember anyone hating?
16    Q. Hitting.
17    A. Oh, hitting. From that video that we
18 just saw?
19    Q. No. Just from what your memory is.
20    A. What I can remember -- I don't remember,
21 actually.
22    Q. Uh-huh.
23      Let's let it play a little further.
24      (Video playing.)
25    Q. BY MR. KANE: Seeing that video, does

**Page 36**

1  that refresh your memory of anything unusual that
2  might have happened that you saw?
3     A. The unusual thing is that someone --
4  Avalon Hardy was getting arrested and they didn't
5  tell her why. That was the most unusual part. And
6  the officers pushing me while I was asking why is
7  she being arrested.
8     Q. And why were you asking those questions?
9     A. Because I wanted to know why she was
10 being arrested.
11    Q. And are you saying that you did not make
12 a link in your mind between what she had done a few
13 minutes earlier with Officer Kish as to her arrest?
14    A. She didn't -- I didn't link it, no.
15    Q. Okay. Let's make it easy. Avalon Hardy
16 has sworn under oath that while she was being
17 handcuffed she was hit by parties unknown.
18      Did you see that happen?
19    A. Not that I can recollect. I don't
20 believe I was paying attention fully to whatever
21 was going on with Avalon.
22    Q. You never saw her being hit by anyone?
23    A. I was around Avalon. I don't remember
24 if she was hit or not.
25    Q. Alright.

**Page 37**

1       So you're not going to come into court
2  in this trial and tell the jury that you saw her
3  getting hit. Is that fair?
4     A. I don't believe from what I can
5  recollect I can't say or deny that she was hit.
6     Q. You just didn't see it with your own
7  eyes?
8     A. That's correct.
9     Q. Okay.
10      After Avalon Hardy was arrested, when
11 was the next time that you saw her?
12    A. When she got out of jail.
13    Q. Next day?
14    A. I don't remember exactly when she got
15 out, but I was there.
16    Q. You were there when she got out of jail,
17 you say?
18    A. Yes.
19    Q. And how did that happen? Did she call
20 you?
21    A. No.
22    Q. How did you know she was getting out of
23 jail?
24    A. Because I was listening in on her trial.
25    Q. No, I'm talking being released from the

10 (Pages 34 - 37)

Destinee Brooks June 11, 2024

1    A.  Not that I can recollect.
2    Q.  Did she ever tell you who committed
3  these injuries on her?
4    A.  She must have at the time, but I can't
5  recollect exactly who.
6    Q.  So you're not going to come into trial
7  and say, "Avalon Hardy told me that, 'I was injured
8  by a police officer'"?
9    A.  If she -- no.
10    Q.  Did she ever tell you that a
11  pro-abortion protester injured her in any way?
12    A.  No.
13    Q.  Did she ever tell you that she had been
14  attacked while she was being walked to the police
15  car after she had been handcuffed?
16    A.  Not that I can remember at the moment.
17    Q.  Did you see that happen?
18    A.  I was preoccupied with other police
19  officers.  I didn't see that.  I saw officers
20  pushing me.
21    Q.  I'm talking while she was actually being
22  walked to the police car.  Do you remember her
23  being --
24    A.  That is when I was being pushed by
25  police officers.

Page 46

1    Q.  So the answer is no, you don't remember
2  anyone attacking her?
3    A.  Because I didn't see it because I was
4  preoccupied.
5    Q.  Well, I'm not saying it happened.  I'm
6  just asking you, did you ever see her be attacked?
7    A.  I'm telling you what I was doing during
8  or -- during the proposed attack.
9    Q.  So you never saw anyone attack her, yes
10  or no?
11    A.  From where my eyes were, no.
12    Q.  Alright.  You never saw her get
13  attacked?
14    A.  From -- no.
15    Q.  Alright.
16    MR. KANE:  That is all I have.  Thank you.
17  You are done.
18    THE WITNESS:  Okay.
19    MR. EPPINK:  I will ask that the witness
20  read and sign.
21    (Deposition concluded at 9:47 a.m.)
22    (Signature requested.)
23
24
25

Page 47

1    REPORTER'S CERTIFICATE
2
STATE OF IDAHO )
3          ) ss.
COUNTY OF ADA )
4
5    I, MISTI L. ALCALDE, Certified Shorthand
6  Reporter and Notary Public in and for the State of
7  Idaho, do hereby certify:
8    That prior to being examined, the witness
9  named in the foregoing deposition was by me duly sworn to
10  testify to the truth, the whole truth, and nothing
11  but the truth;
12    That said deposition was taken down by me in
13  shorthand at the time and place therein named and
14  thereafter reduced to typewriting under my
15  direction, and that the foregoing transcript
16  contains a full, true and verbatim record of said
17  deposition.
18    I further certify that I have no interest in
19  the event of the action.
20    WITNESS my hand and seal this 24th day of
21  June, 2024.
22
23
    MISTI L. ALCALDE RPR and Notary
24    Public in and for the State of Idaho.
25  My Commission Expires: 7-7-27

Page 48

1  RICHARD ALAN EPPINK
2  ritchie@wrest.coop
3        June 25, 2024
4  RE:  HARDY v. KISH et al.
5    6/11/2024, DESTINEE BROOKS (#6711866)
6    The above-referenced transcript is available for
7  review.
8    Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  Calendar-Idaho@veritext.com
16
17  Return completed errata within 30 days from
18  receipt of testimony.
19    If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22    Yours,
23    Veritext Legal Solutions
24
25

Page 49

13 (Pages 46 - 49)

**Richard Eppink** (ISB No. 7503)
ritchie@wrest.coop
**David A. DeRoin** (ISB No. 10404)
david@wrest.coop
**Wrest Collective**
812 W. Franklin St.
Boise, ID 83702
208-742-6789 (phone)

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| **AVALON HARDY**,<br><br>                              Plaintiff,<br><br>vs.<br><br>**MICHAEL KISH**, et al.<br><br>                              Defendants. | Case No. 1:23-cv-306-BLW<br><br>**PLAINTIFF'S RESPONSES DEFENDANTS' FIRST SET OF DISCOVERY** |

Plaintiff, with her attorneys, provides the following answers, responses, and objections to Defendants First Set of Discovery to Plaintiff Avalon Hardy, propounded 10/24/2023.

By answering and responding to Defendants' requests, Plaintiff does not agree or stipulate to Defendants' instructions or definitions; Plaintiff objects to them to the extent they do not conform to or require more than the rules and law governing discovery.

down the Capitol steps. They grabbed me and put me in handcuffs. They walked

me through a crowd of anti-abortion protestors and the officers let them hit me in

the ribs. The officers never told me why I was arrested, even though I asked. They

searched me and still didn't tell me why I was arrested. They put in in the back of a

patrol car and still wouldn't tell me why I was arrested. Destiny Brooks also asked

officers multiple times why I was arrested, and they would not tell her either. The

transporting officer finally told me what my charges were, while I was being taken

to jail.

I was bruised in the ribs from being hit by anti-abortion protestors while

officers were parading me through them in handcuffs. I was bruised on the wrists

from being handcuffed. I was unable to take clients at my salon because my wrist

hurt so bad and my business suffered as a result and also because of the stress,

anxiety, other emotional and mental impacts, plus the loss of time all caused by the

arrest and the court process in the criminal case prosecuted against me. I was

separated from my family and held in jail overnight without bond. I still get

exacerbated anxieties whenever I encounter any law enforcement, as they did not

help or protect me at all that day. I now sometimes have panic attacks and am

unable to breathe, and large crowds now make me feel trapped. I am

hypersensitive as a result of what Defendants did.

Officer DeBie had no reason to write anything to support my arrest in the

first place. Officer Kish had no reason to say that I assaulted him in any way.

Officer Ketchum had no reason to order me arrested. Officers Card and McClain

RESPONSES TO DEFENDANTS' FIRST SET OF DISCOVERY – Page 5

because Plaintiff did not know that Defendant Kish was a law enforcement officer at the June 28, 2022, event that is the subject of her Complaint.

REQUEST FOR PRODUCTION [sic] NO. 12: Please set forth all residential addresses where you have lived from January 1, 2022, to the present, with the accompanying time period at each residence.

OBJECTIONS: A request for production under FRCP 34 allows a party to serve a request to produce designated documents, electronically stored information, or tangible things. This request does not appear to request such things; rather, it seems to be an interrogatory and so should be counted as one of Defendants' 25 interrogatories under the parties' Discovery Plan.

ANSWER: Answering this "request for production" as an interrogatory, Plaintiff resided at 501 E. 44th St. #11, Garden City, Idaho 83714, from January 1, 2022, until September 2022, when she moved to 2725 S. Owyhee #101, Boise, Idaho 83705. She continued to reside on Owyhee St. until September 2023, when she moved to 229 S. Phillipi St. #110, Boise, Idaho 83705, where she has resided since then.

Pursuant to 28 USC § 1746, I declare verify under penalty of perjury that the foregoing is true and correct.

Executed on November 24, 2023.

_____
Avalon Hardy

Filed: 04/18/2023 09:59:41
Fourth Judicial District, Ada County
**Trent Tripple, Clerk of the Court**
By: Deputy Clerk - Andrews, Tia

IN DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT

OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

- - - - - - - - - - - - - - - - - - - x   Case No. CR01-22-20001
                                  :
STATE OF IDAHO,                   :
                                  :
                 Plaintiff,      :
                                  :
         vs.                      :
                                  :
AVALON SHAWNTAE HARDY,     :
                                  :
                 Defendant.      :
                                  :
- - - - - - - - - - - - - - - - - - - x

**<u>REPORTER'S TRANSCRIPT OF PROCEEDINGS</u>**

**Held on January 27, 2023, before**

**Honorable Michael Dean, Magistrate Court Judge.**

CERTIFIED TRANSCRIPT

Reported by
Lisa Doyon
CSR No. 1116

**KANE MSJ AFFIDAVIT, EXHIBIT F**

1    following grounds -- primarily it's sub two there,

2    A(2), for any other reason, the Court concludes

3    dismissal will serve the ends of justice and the

4    effect of administration of the Court's business.

5            So to be given two particular reasons.

6    Let me state at the outset, the number of concerns

7    I have right now.  One, the discovery given in

8    this particular case in which there were no

9    statements by this witness.  And we had these

10   conversations earlier today.  No statements by

11   this witness.  So the only statements as to

12   anything that happened was the video given and

13   those obtained somehow in social media.  And

14   secondarily, the report issued by a different law

15   enforcement officer, which quite frankly, the

16   witness today testified portions of it did not in

17   fact happen -- or that may have been his

18   perspective, but I don't recall that.  I don't

19   recall the number of "I don't recalls" taking

20   place.  Didn't recall a number of things there.

21           The primary testimony from the State's

22   witness today was that he showed up.  He had his

23   hands raised kind in the general area of talking a

24   little above his waist, chest level, gesturing

25   with his hands, which watching the video, it's

1    clear his hands had moved out in some semblance,

2    trying to hold Ms. Hardy back, that he had turned

3    his back to her, that while his back was turned,

4    she had pushed in to him slightly.  And he said

5    came into contact with his back as if trying to

6    push past.

7              He had talked about a potential bump or

8    push into.  It's always somewhat difficult for

9    someone to ascertain what is taking place when

10   someone's back is turned to them, and it's unknown

11   what is taking place there.  That seemed to be the

12   extent of the testimony on the State's case.

13             And I'll note the testimony was scant.

14   I don't know if we made it ten minutes in

15   testimony or not in this particular case from the

16   State before they rested.

17             In regards to the defense -- and

18   State's Exhibit 1 was admitted.  In regards to the

19   defense, under the defense testimony, the

20   primary -- there was some discussion of moving a

21   hand or potential slapping of a hand.  Once again,

22   that's not charged whatsoever in the complaint, so

23   none of that's alleged in the complaint.

24             The primary thing being shove, push, or

25   chest bump there.  And she said that -- under

KANE MSJ AFFIDAVIT, EXHIBIT F

1    some indication again in the video that her

2    hand -- the officer's hand was on her arm.  She

3    may have pushed his arm down.  Once again, that's

4    not the charge here.

5              The testimony entirely from the State

6    was the -- and the allegation here, the pushing,

7    the chest bumping, and that's what I took all the

8    testimony here, the chest bumping.

9              When I watch this, the relevant portion

10   seemed to be -- well, at the beginning, when his

11   arm was up against her, I can't find that he was

12   pushing her or she was pushing him.  I don't know.

13   They're both in contact.  He's doing something

14   with his left arm against her.  I can't find that

15   she's chest bumping, pushing, or shoving him at

16   that point.

17             There is a later portion where he turns

18   his back to her, and she makes a movement that the

19   Court would best describe as trying to go around

20   him -- seemed to go around him.  From the Court's

21   perspective, she was looking not at him.  Some

22   people had held her back and she was going

23   around -- almost as if she was trying to go around

24   him, come towards the camera more to go around

25   him.

KANE MSJ AFFIDAVIT, EXHIBIT F

1              And from the Court's perspective, there

2      may have been inadvertent brush with the -- for

3      lack of a better term with her breast or something

4      else against the officer's shoulder, him turning,

5      then, back in to you.

6              So that's at most you trying to get

7      around him.  This case does require that you

8      actually, intentionally, and unlawfully touched or

9      struck the person against his will by shoving,

10     pushing, and/or chest bumping him.

11             Once again, the witness's testimony

12     seemed to be, from the Court's perspective,

13     contradicted by the very video introduced by the

14     State.  I'm surprised at a couple of things.  One

15     may be the nature in which it was charged.  This

16     seems to be entirely incidental contact that I

17     saw, what I noted in Ms. Hardy attempting to go

18     around the officer.

19             The officer had been pushing back with

20     his left hand just under and around her breast.  I

21     don't think once again that was intentional.  One

22     instance where her arm came down, but that wasn't

23     charged or testified to much to today.  The

24     primary portion being her trying to get around

25     while his back was turned.

1              The Court notes I saw her looking in a

2     different direction, not at the officer, almost

3     looking ahead of where she was trying to go,

4     slipping around.  This being a very crowded room,

5     and I'll note in this case, that this charge

6     requires some type of intentional conduct, that

7     there be some intentional touching of the witness.

8     To the extent there was any touching, this appears

9     to be surely incidental, unintentional, as she

10    trying to get around him, and then turns back.

11             In this case, I simply cannot find

12    there's sufficient information to go to the jury.

13    I'm going to grant the defense request to dismiss

14    this case.  I'll note additionally, given what I

15    saw, I'm doing this under Rule 29, but had it been

16    brought under Rule 48, it very well may have been

17    granted in that situation under Rule 48, which I

18    believe requires notice, but the ends of justice,

19    I would tend to think after watching that video

20    would also require this.

21             So I would note, I'm disappointed in

22    the nature of the discovery that was given.  The

23    officer testifying for the first time here, and

24    the characterizations given to the Court there was

25    no notice of what -- essentially what his

**KANE MSJ AFFIDAVIT, EXHIBIT F**

# EXHIBIT G

**Affidavit of Michael Kane in Support of Defendants'
Motion for Summary Judgment**

**<u>You Tube Video (provided by Plaintiff in discovery)</u>**

**Avalon Hardy v. Michael Kish, et al.**

**USDC Case No. CV23-00306-BLW**

**This FLASH DRIVE will be mailed to the Court
and parties via regular U.S. Mail on July 12,
2024.**

# EXHIBIT H

**Affidavit of Michael Kane in Support of Defendants'
Motion for Summary Judgment**

## July 12-2 Video (provided by Plaintiff in discovery)

**Avalon Hardy v. Michael Kish, et al.**

**USDC Case No. CV23-00306-BLW**

**This FLASH DRIVE will be mailed to the Court
and parties via regular U.S. Mail on July ___,
2024.**

Idaho State Police
700 South Stratford Drive
Meridian, ID 83642
208-884-7360

IN THE DISTRICT COURT OF THE 4TH JUDICIAL DISTRICT OF THE STATE OF
IDAHO, IN AND FOR THE COUNTY OF ADA
IN THE MATTER OF

HARDY, AVALON SHAWNTAE
DOB:07/12/1987
Idaho DL#ZE312187J                    ISP Case NumberB22001817
Defendant                             Citation

STATE OF IDAHO
COUNTY OF ADA

      Sergeant Troy DeBie, being first duly sworn, deposes and says:

      1. THAT he/she is a police officer for the Idaho State Police for 15years.

      2. THAT on the 28th day of June 2022, he/she initiated a complaint against the
named defendant AVALON HARDY for the crime of Battery Upon Certain Personnel
I.C. 18-915 .The report thereof attached hereto and incorporated by reference to this
Affidavit sets forth the basis for probable cause for the arrest or bonding of the named
defendant.

      3. THAT the following statement is offered as probable cause if no report is
attached.

On June 28, 2022 at approximately 6:52 p.m., Idaho State Police Sergeant Michael Kish
was assisting with managing the security of all participants during a planned protest at
the Idaho State Capitol, located at 700 W. Jefferson St, City of Boise, Ada County,
Idaho. While trying to separate a fight between two protesters Sergeant Kish was able
to get between the two individuals. A female, later identified by Sergeant Kish as
AVALON HARDY, began to shove Sergeant Kish repeatedly with her hands. Sergeant
Kish was wearing a bussiness suit with his Idaho State Police Badge and issued firearm
on his belt. He identified himself as a police officer to HARDY. She continued to shove
him with her hands and chest. Sergeant Kish and HARDY got separated in the crowd.
At approximately 7:12 p.m., HARDY was located in the crowd and placed into custody
by Idaho State Police Trooper Kyle Card. He handcuffed her hands behind her back
and searched her by a Boise Police patrol vehicle. She was placed in the patrol vehicle
and transported to the Ada County Jail. HARDY was left in the custody of the Ada
County Jail Deputies for the charge of Battery Upon Certain Personnel I.C. 18-915.

I certify (or declare) under penalty of perjury pursuant to the law of the State of Idaho
that the foregoing is true and correct.

6/29/2022
(Date)                                        (Signature)

EH 07.03                                                          Rev.4/2018